**CITY OF ROME, GEORGIA, et al., Plaintiffs,**

v.

**UNITED STATES of America et al., Defendants.**

Civ. A. No. 77–0797.

United States District Court, District of Columbia.

April 9, 1979.

## OPINION

McGOWAN, Circuit Judge:

This is a declaratory judgment action brought under the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.* It is before the Court on pleadings styled cross-motions for summary judgment, based on evidence developed in a stipulated record. Although the parties recognize that the record presents genuine issues of material fact, they are willing for us to resolve these issues and reach final judgment. This we have done in the following opinion, which shall constitute the Court's Findings of Fact and Conclusions of Law as required by the Federal Rules.

### I

### A.

Plaintiff City of Rome (Rome or the City) is a municipality situated in Floyd County, northwestern Georgia. Its 1970 population was 30,759, of whom 23,543, or 76.6%, were white and 7,216, or 23.4%, black. Of its total 1970 voting age population, 79.4% were white and 20.6% black; as of 1975, its 13,097 registered voters were 83.9% white and 15.5% black. The City is administered by a council-manager form of government. Plaintiff Bruce Hamler is the Rome City Manager and plaintiff H. F. Hunter, Jr. is Chairman of the Rome City Commission.[1]

The basic structure of the City's government was established by a Charter enacted in 1918 by the Georgia General Assembly. The charter provided for a Commission of seven members, one from each of seven wards, elected concurrently, at large, and by plurality vote. The same Charter established a Board of Education, consisting of five members elected concurrently, at large, and by plurality vote; unlike the City Commission, however, there was no residency requirement for the Board of Education. In 1929 two additional wards were annexed to the City, making a total of nine, and seats for these wards were provided in the

Robert M. Brinson, City Atty., City of Rome, Ga., and William E. Sumner, Atlanta, Ga., for plaintiffs, with whom was Joseph W. Dorn, Washington, D. C.

Paul F. Hancock, Atty., Dept. of Justice, Washington, D. C., for defendants, with whom were Drew S. Days III, Asst. Atty. Gen., Gerald W. Jones, Frederick J. McGrath, and Carmen L. Jones, Attys., Dept. of Justice, Washington, D. C.

Before McGOWAN, Circuit Judge, and GASCH and RICHEY, District Judges.

---

1. Parties' First Stipulation of Facts 1–2.

City Commission. Election rules, however, remained substantially unchanged.[2]

Beginning in 1966, and after the November 1, 1964 coverage date of the Voting Rights Act, the Georgia General Assembly through Charter amendment made a number of changes in Rome's election procedures. It enacted a majority vote requirement for Commission and Board of Education general and primary elections and provided for the conduct and timing of runoff elections;[3] reduced the number of wards from nine to three;[4] provided that the Commission was to consist of one Commissioner from one of three numbered posts in each of three wards;[5] increased the size of the Board of Education from five to six;[6] provided that the Board of Education was to consist of one member from one of two numbered posts in each of three wards and that each candidate had to be a resident of the ward in which he ran;[7] instituted staggered terms in the Commission and Board of Education;[8] eased restrictions on voter qualifications;[9] and transferred voter registration responsibility to the County.[10] In addition to these changes in voting procedures, some sixty annexations were effected after November 1, 1964 either by state law or by local ordinance.[11]

### B.

The parties have developed voluminous evidence bearing on the history and present condition of black political affairs in the City of Rome. On the City's side of the balance sheet, we find that no literacy test or other device has been employed in Rome as a prerequisite to voter registration during the past seventeen years. While registrants were technically required to pass the state literacy or character tests, the affidavits of the City officials responsible for voter registration, supported by the unanimous testimony of black deponents, are to the effect that such tests have never been applied discriminatorily and have not been administered at all in recent years.[12] Similarly, the City has not employed other barriers to registration with respect to time and place, registration personnel, purging, or reregistration.[13] Also probative of the lack of discrimination in registration is the fact that black registration remained at a relatively high level throughout the period 1963–74.[14]

2. *Id.* at 3–4.

3. 1966 Ga.Laws 2376; *id.* 2383; *id.* 2816–17; *id.* 3084; 1970 Ga.Laws 2563–64.

4. 1966 Ga.Laws 2379–80.

5. 1966 Ga.Laws 2375–76; *id.* 2383–84.

6. 1966 Ga.Laws 2816.

7. 1966 Ga.Laws 2816.

8. 1966 Ga.Laws 2375–76; *id.* 2816–17; 1967 Ga.Laws 3296–97.

9. 1966 Ga.Laws 3069–70.

10. Parties' First Stipulation of Facts, Ex. 24–25.

11. *Id.* at pp. 5–6.

12. Affidavits in Support of Plaintiffs' Motion for Summary Judgment of Mrs. Ray Beard and Mrs. Helen Dowdy; Carmichael Deposition 21; Jackson Deposition 10; Aycock Deposition 7, 45; James Wright Deposition 22; Houser Deposition 8; Thomas Deposition 16–17; Moreland Deposition 48–49, 54; Joe Wright Deposition 42–43, 48; Fielder Deposition 69–71.

13. Joe Wright Deposition 42–43, 48; James Wright Deposition 22–23; Aycock Deposition 44–45; Fielder Deposition 70; Moreland Deposition 49.

14. Plaintiffs' Answers to Defendants' Interrogatories, Ex. 1. Plaintiffs supplied the following breakdown of total registered voters in Rome during this period:

| YEAR | TOTALS BY RACE | | TOTAL REGISTERED VOTERS |
| --- | --- | --- | --- |
| | WHITE | BLACK | |
| 1963 | 8097 | 1832 | 9929 |
| 1964 | 8313 | 1864 | 10177 |
| 1965 | 11241 | 2637 | 13878 |
| 1966 | 9182 | 2154 | 11336 |
| 1967 | 9532 | 2236 | 11768 |
| 1968 | 10585 | 2483 | 13068 |
| 1969 | 9906 | 2324 | 12230 |
| 1970 | 11081 | 2599 | 13680 |
| 1971 | 9969 | 2338 | 12307 |
| 1972 | 10481 | 2458 | 12939 |
| 1973 | 10080 | 2365 | 12445 |
| 1974 | 10610 | 2489 | 13099 |

Further, at least in recent years there have been no other direct barriers to black voting in Rome. Blacks have not been denied access to the ballot through the location of polling places, the actions of election officials, the treatment of illiterate voters or similar means. Nor is there any evidence of obstacles to black candidacy with respect to slating of candidates, filing fees, obstacles to qualifying, access to voters at polling places, or the like.[15] Indeed, whites, including City officials, have encouraged blacks to run for elective posts in Rome.[16] A black, Elgin Carmichael, was appointed to the Board of Education when a vacancy occurred in that body.[17]

The white elected officials of Rome, together with the white appointed City Manager, are responsive to the needs and interests of the black community.[18] The City has not discriminated against blacks in the provision of services and has made an effort to upgrade some black neighborhoods.[19] The City transit department, with a predominantly black ridership, is operated through a continuing City subsidy.[20] And the racial composition of the City workforce approximates that of the population, with a number of blacks employed in skilled or supervisory positions.[21]

In Rome politics, the black community, if it chooses to vote as a group, can probably determine the outcome of many if not most contests.[22] Thus, many white candidates vigorously pursue the support of black voters.[23] Several present Commissioners testified that they spent proportionally more time campaigning in the black community[24] because they "needed that vote to win."[25]

On the other hand, most black voters would prefer to have a black official representing their interests.[26] Yet there has never been a black elected to political office in the City of Rome. Indeed, only four blacks have ever sought such office. Two of them, M. D. Whatley and Dr. John W. Houser, Jr., ran for the Board of Education in the 1950's and early 1960's, respectively; neither did well.[27] Another black, Samuel Stubbs, ran in the 1972 Republican primary election for City Commission, and received only 79 votes out of the 276 cast.[28]

By far the strongest black candidate in Rome's history was Rev. Clyde Hill, who ran for the Board of Education in 1970

15. Defendants' Responses to Plaintiffs' Second Request for Admission of Facts and Genuineness of Documents, Nos. 4(a), 4(b), 31.

16. Carmichael Deposition 31; Moreland Deposition 31; Hamler Deposition 48–50; Harvey Deposition 26.

17. Carmichael Deposition 7.

18. *Id.* at 23–24, 30, 39–40; Fielder Deposition 56; Houser Deposition 11–14; Jackson Deposition 42–45 (noting, however, that responsiveness of City Manager was greater than that of Commissioners); Moreland Deposition 18, 40.

19. Hamler Deposition 57–66, 76–85, 142–145; Hunter Deposition 41–44, 65, 79–81.

20. Hamler Deposition 91–98; Wade Deposition 22–26.

21. Hamler Deposition 98–115; Wade Deposition 32–33; Hunter Deposition 28–29; Clary Deposition 65–66.

22. Although voters in Rome are predominantly Democrats, elections in the City are by no means a foregone conclusion; indeed, 6 of the 9 City Commissioners are Republicans, as is 1 of the 6 members of the Board of Education. Hunter Deposition 9.

23. Clary Deposition 58–61; Hamler Deposition 44–47; Aycock Deposition 39–41; Carmichael Deposition 40; Moreland Deposition 38–39.

24. Harvey Deposition 18–24; Hunter Deposition 14–17, 27; Wade Deposition 17–18.

25. Wade Deposition 18; *see* Harvey Deposition 20.

26. Carmichael Deposition 12; Aycock Deposition 53, 75–76; Jackson Deposition 11; James Wright Deposition 51–53; Joe Wright Deposition 20–21; Fielder Deposition 50.

27. Aycock Deposition 9–10; Carmichael Deposition 13; Fielder Deposition 17; Houser Deposition 4–6, 10–11, 21; James Wright Deposition 36, 54–55.

28. Stubbs Deposition 4; Parties' First Stipulation of Facts, Ex. 32.

under the numbered-post, residency ward, majority-win system instituted in 1966.[29] Rev. Hill ran a vigorous campaign against three white opponents, and, with the strong support of the black community, received a plurality of the votes cast in the general election.[30] Because he did not receive a majority, however, he was forced into a runoff election with the runner-up and was defeated.[31]

In the years since the failure of Rev. Hill's candidacy, the black community in Rome has been politically apathetic.[32] It is widely believed among blacks that a black will never be elected to public office in Rome as long as the present majority-win system remains in effect.[33] A number of qualified blacks will not run for office be-cause in their judgment they could not get a majority of the votes.[34]

Underlying this perception in the black community is a belief that bloc voting by race exists in the City of Rome. Racial bloc voting is a situation where, when candidates of different races are running for the same office, the voters will by and large vote for the candidate of their own race.[35] Unfortunately, a statistical demonstration of the existence *vel non* of racial bloc voting is impossible in the present case.[36] There is, however, other evidence of record probative of the existence of racial bloc voting.

First, the virtually unanimous testimony of black deponents was that, given a choice, voters in Rome will tend to vote for the candidate of their own race.[37] However,

---

**29.** Hill Deposition 12–13.

**30.** *Id.* at 17–18; Joe Wright Deposition 9–13; Aycock Deposition 16; James Wright Deposition 12; Moreland Deposition 10–12. Hill received 921 votes, as against 909 for Dr. Sara L. Hoyt, 407 for Jean V. Anderson, and 143 for Rev. Warren L. Jones. Parties' First Stipulation of Facts, Ex. 28.

**31.** Dr. Hoyt received 1409 votes in the runoff election as compared with 1142 for Rev. Hill. Parties' First Stipulation of Facts, Ex. 29.

**32.** Hill Deposition 31; Jackson Deposition 11. Rev. Hill's defeat in the runoff, after his seeming victory in the general election, came as a bitter disappointment to many in the black community. In the words of one deponent, it "killed a political dream of the people," so that young blacks particularly "have no faith in the political process here in the City of Rome." Moreland Deposition 12, 6.

**33.** Hill Deposition 23, 30; Joe Wright Deposition 15–16; Aycock Deposition 24; James Wright Deposition 13; Thomas Deposition 11–12; Moreland Deposition 14–15; Jackson Deposition 25. This conclusion was disputed by white City officials. Hunter Deposition 71, 78; Hamler Deposition 138–139; Wade Deposition 19.

**34.** James Wright Deposition 14; Fielder Deposition 26; Joe Wright Deposition 14; Carmichael Deposition 14; Hill Deposition 31.

**35.** The Supreme Court has recognized the existence of racial bloc voting and its effect on the minority race within the district:

> Where it occurs, voting for or against a candidate because of his race is an unfortunate practice. But it is not rare; and in any district where it regularly happens, it is unlikely that any candidate will be elected who is a member of the race that is in the minority in that district.

*United Jewish Organizations v. Carey*, 430 U.S. 144, 166–67, 97 S.Ct. 996, 1010, 51 L.Ed.2d 229 (1977) (plurality opinion).

**36.** The surest method of demonstrating racial bloc voting is to analyze the results, broken down into a number of districts of differing racial makeup, of an election in which a white candidate is pitted against a black one. If there is a positive correlation in a sufficient number of districts between voters of one race and the percentage of votes received by the candidate of that race, then it can be inferred that racial bloc voting has occurred. Stated more impressionistically, if District A is 80% white, and the white candidate receives 80% of the vote, and District B is 80% black, and the black candidate receives 80% of the vote, it is a ready inference that white voters voted for the white candidate and blacks for the black. For a clear example of this type of statistical demonstration, *see City of Petersburg v. United States*, 354 F.Supp. 1021, 1026 n.10 (D.D.C. 1972), *aff'd*, 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973).

This type of analysis is impossible in Rome's case because, of the four races in which blacks ran against whites, two—those of M. D. Whatley and Dr. John W. Houser—occurred many years ago and apparently no records have survived, one—that of Samuel Stubbs—did not involve a sufficient number of votes, and one—that of Rev. Hill—could not be broken down by district. *See* Loewen Deposition 61–62.

**37.** Aycock Deposition 20; James Wright Deposition 8; Moreland Deposition 10; Carmichael Deposition 11; *but see* Houser Deposition 17.

some deponents also opined that a given black candidate could pick up significant white support, although not enough to win.[38] White officials, on the other hand, unanimously testified that racial bloc voting does not exist in Rome.[39] Much of this opinion testimony, of course, is based on inferences drawn from the results in previous elections, particularly that involving Rev. Hill—facts which more effectively speak for themselves. However, the testimony would also appear to reflect inferences drawn from these long-time residents' knowledge of the racial atmosphere in Rome.[40] *See* Fed.R.Evid. 701. To this extent, the inference that bloc voting does exist is the more credible and rational one, because the white officials testifying to the contrary are "interested witness[es]," *see City of Richmond v. United States*, 422 U.S. 358, 377, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975), because a belief in racial bloc voting was the predicate for decisions by a number of black deponents not to run for elective office, and because other relevant evidence interacts with and supports the conclusion that a substantial degree of racial bloc voting exists.

Rev. Hill's campaign is perhaps the clearest indication of the extent of racial bloc voting in Rome. With the solid support of the black community, Rev. Hill, as we have noted, achieved a plurality of the votes cast in the general election. In his losing runoff campaign, however, he picked up only 221 additional votes while his opponent gained 500. Moreover, although a lower turnout might have been expected for a runoff election involving a single Board of Education seat, 171 more votes were cast in the runoff than in the general election.[41] The most

reasonable explanation for these results is that the white community, confronted with the imminent prospect of a black being elected, coalesced to defeat Rev. Hill. At the same time, it is probable that Rev. Hill did receive a sizable number of white votes. Even assuming that Rev. Hill's vigorous campaign impelled an unprecedented number of blacks to the polls, this factor alone probably cannot account for his 45% runoff tally in a town of roughly 15% black registration.

Finally, Dr. James W. Loewen, a political sociologist, testified as an expert witness that racial bloc voting existed in Floyd County during the 1968 Democratic United States Senate primary between Herman Talmadge and Maynard Jackson. Dr. Loewen concluded that at a minimum 88.9% of the whites in Floyd County voted white and approximately 76.2% of the blacks voted black.[42] The value of this testimony, of course, must be discounted by the fact that the Jackson-Talmadge race involved state and national rather than local issues, occurred more than a decade ago, and was analyzed on a county-wide rather than city-wide basis. Nevertheless, despite these cautionary factors, Dr. Loewen's testimony is probative of the existence of racial bloc voting in Rome. Taking these three strands of evidence together—the testimony of black deponents, the results of Rev. Hill's campaign, and the conclusions of the expert witness—we find that a substantial measure of racial bloc voting does exist in the City of Rome.

### C.

The present litigation was seeded on June 15, 1974, when the City submitted an annexation to the Attorney General for ap-

---

Of course, the existence of bloc voting is the obvious, if sometimes unstated, premise upon which numerous deponents based their conclusion that no black could win an election in Rome. *See* note 34 *supra.*

**38.** Carmichael Deposition 15; Jackson Deposition 55. Rev. Hill testified that he received considerable white support during his campaign, including financial contributions and printing services donated by a white-owned business. Hill Deposition 28, 36.

**39.** Harvey Deposition 65; Hunter Deposition 17–18, 75; Wade Deposition 12–13, 39–49, 53; Clary Deposition 59–60, 81–85; Hamler Deposition 120–121, 159–161; Harry Johnson Affidavit.

**40.** *E.g.,* Carmichael Deposition 14.

**41.** *See* notes 30–31 *supra.*

**42.** Loewen Deposition 15.

proval pursuant to section 5 of the Voting Rights Act.[43] As a result of his investigation,[44] the Attorney General discovered that the other annexations and voting changes described above, *see* text accompanying notes 3–11 *supra,* had not been submitted for preclearance either to him or to this Court as required by section 5.[45] Eventual-

**43.** Section 5 of the Act, 42 U.S.C. § 1973c, provides that:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the third sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

The State of Georgia has been designated a covered subdivision pursuant to § 4 of the Act, 30 Fed.Reg. 9897 (1965), and its municipalities are required to comply with § 5, *United States v. Board of Commissioners (Sheffield),* 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978).

**44.** On July 24, 1974, the Attorney General requested additional information regarding the submitted annexation, as well as disclosure regarding any other City annexations occurring since the effective date of § 5. Rome responded on Feb. 10, 1975, by submitting 59 additional annexations for preclearance. On March 6, 1975, the Attorney General requested further information regarding the annexations and asked the City whether there had been any changes in its electoral system since the effective date of § 5. Rome responded on June 2, 1975, supplying further information as to the annexations and confirming for the first time the existence of numerous changes in its voting rules. As a result of this disclosure, the Attorney General on August 1, 1975 interposed a technical objection to the annexations. On August 21, 1975, the City finally submitted its electoral changes for preclearance. *See* Second Supplement to Parties' Stipulation of Facts, Ex. 45.

**45.** The voting changes at issue in this case are no doubt within the purview of § 5, *Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Allen v. State Bd. of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), as are the annexations insofar as they affect voting, *City of Richmond v. United States,* 422 U.S. 358, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975); *Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971); *City of*

ly, Rome submitted all but one of these changes to the Attorney General for pre-clearance.[46] During the course of the administrative proceedings the Attorney General failed to object or withdrew his objections to, and thereby precleared, the following: (1) 47 of the 60 annexations; (2) the reduction in wards from 9 to 3; (3) the increase in size of the Board of Education from 5 to 6; and (4) the easing of restrictions on voter qualifications. The Attorney General did object, however, to (1) 13 annexations, insofar as they relate to City Commission elections; (2) (a) majority vote, (b) runoff,[47] (c) numbered post, and (d) staggered term provisions for City Commission and Board of Education elections; and (3) the residency requirement for Board of Education elections.[48]

After the Attorney General refused to reconsider his decision, plaintiffs filed the present lawsuit. During the course of the litigation, two of plaintiffs' claims (Counts I and V of their amended complaint) were eliminated,[49] and the remaining issues are essentially four in number. Plaintiffs contend that Rome is entitled to "bail-out" from coverage pursuant to section 4 of the Act (Count II); that some or all of the

objected-to changes have already been administratively precleared (Count III); that section 5 is unconstitutional (Count IV); and that the disputed changes have neither the purpose nor the effect of denying or abridging the right to vote on the basis of race or color (Count VI). The first three of these are either pure questions of law or issues as to which the facts are undisputed, and are therefore appropriately disposed of on summary judgment. The fourth question does involve genuine issues of material fact, but because, as we have noted, the parties are willing for us to reach a judgment based on the stipulated record, we make Findings of Fact and Conclusions of Law on this count also.

## II

■ As an initial matter, the City seeks to "bail-out" from section 5's coverage by invoking the declaratory judgment procedure of section 4(a). Under the structure of the Act, the jurisdictions subject to section 5's preclearance procedures are those "with respect to which the prohibitions set forth in [section 4(a)] are in effect." [50] Section 4(a),[51] in turn, prohibits the use of tests or

---

*Petersburg v. United States*, 354 F.Supp. 1021 (D.D.C.1972), aff'd, 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973). *See also Dougherty County Bd. of Educ. v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978).

**46.** The sole change not submitted to the Attorney General was the transfer of voter registration responsibility to Floyd County, which Rome has submitted directly to this Court pursuant to § 5. Because the Attorney General has not opposed preclearance, we grant the City's request for summary judgment as to this change.

**47.** The Attorney General did not explicitly object to the runoff provisions. However, his objection to the majority vote requirements implicitly included the runoff provisions because the latter would be surplusage in a plurality-win system.

**48.** Parties' First Stipulation of Facts 8–11.

**49.** Count V of plaintiffs' amended complaint charged that the Attorney General had acted unconstitutionally in applying § 5 to the City of Rome. Relying on *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977)

and *Briscoe v. Bell*, 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977), the Court dismissed this count on Feb. 22, 1978. *City of Rome v. United States*, 450 F.Supp. 378 (D.D.C.1978).

Count I of the amended complaint charged that Rome was not a jurisdiction subject to § 5. Plaintiffs concede that this issue was decided adversely to them in the *Sheffield* case, *United States v. Board of Commissioners*, 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978).

**50.** *See* note 43 *supra*.

**51.** The relevant portion of § 4(a), 42 U.S.C. § 1973b(a), provides that

To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, or in contravention of the guarantees set forth in subsection (f)(2) of this section, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made under the first two sentences of subsection (b) of this section or in any political subdivision with respect to which such determinations have been made

devices[52] as prerequisites to voting (1) "in any State" which the Attorney General has determined to fall within the coverage formulae of section 4(b)[53] or (2) in "any political subdivision with respect to which such determinations have been made as a separate unit." However, section 4(a) further provides that "such State or subdivision" may exempt itself—or, as it is sometimes called, "bail-out"—from these prohibitions by bringing a declaratory judgment action before this Court and establishing that "no such test or device has been used during the seventeen years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color." The statutory circle is completed with reference back to section 5: if a jurisdiction succeeds in its bail-out action, the prohibitions of section 4(a) are no longer effective and therefore the jurisdiction is not subject to section 5 preclearance.

The issue of whether municipalities in covered states may independently seek to bail-out is apparently one of first impres-

sion.[54] In arguing its entitlement to such a remedy, the City lays great stress on the recent *Sheffield* decision, *United States v. Board of Commissioners*, 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978), in which the Supreme Court held that when an entire state is subject to the Act, its political subunits must comply with section 5 even though they may not be "political subdivision[s]" as that term is defined in section 14(c)(2) of the Act.[55] The Supreme Court reaffirmed the *Sheffield* holding, after argument in the present case, in *Dougherty County Board of Education v. White*, 439 U.S. 32, 43–47, 99 S.Ct. 368, 375–77, 58 L.Ed.2d 269 (1978). Rome argues that if municipalities are now to be subject to section 5, it would be anomalous and unfair if they are not permitted to bail-out from the Act's coverage under section 4(a).

In statutory terms, the issue is whether Rome is a "State" or "[political] subdivision" within the meaning of section 4(a). Rome argues that in light of *Sheffield*, it must be considered a "political subdivision"

as a separate unit, unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the seventeen years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in subsection (f)(2) of this section.

52. Section 4(c), 42 U.S.C. § 1973b(c), defines "test or device" to mean

any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

53. Section 4(b), 42 U.S.C. § 1973b(b), provides in pertinent part

"The provisions of [§ 4(a)] shall apply in any State or in any political subdivision of a state which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of

voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964."

As we have noted, the Attorney General has determined Georgia to be a covered jurisdiction. *See* note 43 *supra*.

54. Judge Gasch addressed this question in his concurring opinion in *Gaston County v. United States*, 288 F.Supp. 678, 691 (D.D.C.1968), *aff'd*, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969). His conclusion comports with that we reach herein: "No subdivision or part of an area that has been certified can come out alone; each certified unit must petition this Court for relief as a whole." The issue was not squarely presented in *Gaston County*, however, because that case involved a bail-out action brought by a county in a state which, unlike Georgia, had not been certified as subject to § 5.

55. Section 14(c)(2), 42 U.S.C. § 1973*l*(c)(2), provides that

"Political subdivision" shall mean any county or parish, except that where registration for voting is not conducted under the supervision of a county or parish, the term shall include any other subdivision of a State which conducts registration for voting.

for purposes of section 5 and, by implication, section 4. We see little merit to this position. *Sheffield* did *not* hold that municipalities within covered states are "political subdivision[s]"; quite to the contrary, the Court concluded that "[w]here . . . a State has been designated for coverage, the meaning of the term 'political subdivision' has no operative significance in determining the reach of § 5: the only question is the meaning of '[designated] State' ". 435 U.S. at 126, 98 S.Ct. at 976. Moreover, even if Rome were considered a "political subdivision" its cause would not be furthered. The section 4(a) bail-out remedy applies, not to all subdivisions, but only to those the Attorney General has determined to be covered "*as a separate unit*"—an event which has not occurred in Rome's case.

Although Rome is clearly not a "political subdivision" for purposes of section 4(a), a stronger argument can be made that, under *Sheffield*, it is a "State" within the meaning of that section. The Court in *Sheffield* interpreted section 4(a)'s prohibition of tests or devices "in any State" to import a geographical reach. It then inferred that in light of the close connection between sections 4 and 5, the "State[s]" required to seek judicial or administrative preclearance for voting changes under section 5 included not only covered States themselves but also all subsidiary political units within their borders. By like reasoning, it would seem that the "State[s]" entitled to bring section 4(a) bail-out actions should also include political subunits within covered states. Hence, it could be argued, Rome, considered as a "state," should be entitled to its bail-out action here.

Despite the abstract force of this approach, we are unwilling to use logic as a means of subverting congressional intent. *See Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975); *United States v. American Trucking Associations*, 310 U.S. 534, 542–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). And the intent of Congress in the present case is crystal clear. The House Report on the bill that became the Voting Rights Act explicitly rejected Rome's theory: "[The] opportunity to obtain exemption

is afforded only to those States or to those subdivisions as to which the formula has been determined to apply as a separate unit; *subdivisions within a State which is covered by the formula are not afforded the opportunity for separate exemption.*" *H.R. Rep.No.* 439, 89th Cong., 1st Sess. 14 (1965), U.S.Code Cong. & Admin.News 1965, pp. 2437, 2445 (emphasis added) [hereinafter cited as *H.R.Rep.*]. The same point was made by 12 members of the Senate Committee expressing their joint individual views: "We are also of the view that an entire State covered by the test and device prohibition of section 4 must be able to lift the prohibition if any part of it is to be relieved from the requirements of section 4." *S.Rep.No.* 162, Pt. 3, 89th Cong., 1st Sess. 16 (1965) U.S.Code Cong. & Admin. News 1965, p. 2554 [hereinafter cited as *S.Rep.*]; *see also id.* at 21.

Moreover, the construction urged upon us by the City could well lead to many of the same evils whose existence in 1965 prompted passage of the Voting Rights Act. Congress was aware that existing legislation had not succeeded in implementing the Fifteenth Amendment and eliminating the blight of racial discrimination in voting. Efforts to accomplish these goals through case-by-case adjudication had proved ineffective because they were "onerous to prepare" and "exceedingly slow" to produce results. *South Carolina v. Katzenbach*, 383 U.S. 301, 314, 86 S.Ct. 803, 811, 15 L.Ed.2d 769 (1966). And even when litigation was successful, some of the affected jurisdictions "merely switched to discriminatory devices not covered by federal decrees." *Id.* To combat these twin evils of burdensome case-by-case litigation and persistent "obstructionist tactics" by the affected jurisdictions, Congress enacted a series of stern measures, including section 5, to "shift the advantage of time and inertia from the perpetrators of the evil to its victims." *Id.* at 328, 86 S.Ct. at 818.

Permitting political subunits of covered states to bail-out alone would, we believe, subvert the purposes of section 5 by opening the door to a resurgence of these same

evils. It would impose a potentially severe administrative burden on the Attorney General by forcing him to defend numerous bail-out suits brought by political subunits. As noted in the House Report, "to permit each such subdivision to litigate the [bail-out] issue . . . would impose a continuation of the burdensome county-by-county litigation approach which has been shown to be inadequate." *H.R.Rep.*, *supra*, at 14, U.S.Code Cong. & Admin.News 1965, p. 2446.

Even more troublesome is the possibility that covered States could circumvent the purposes of the Act simply by causing their subjurisdictions that have successfully pursued a bail-out remedy to engage in discriminatory practices.[56] In the words of the Senate Committee members, "in most of the States affected by section 4 local boards of registration are so closely and directly controlled by and subject to the direction of State boards of election—and, indeed, the State legislature—that they would be required to misapply tests and devices, irrespective of their own inclinations, if this suited the general policy of the State government." *S.Rep.*, *supra*, at 16, U.S. Code Cong. & Admin.News 1965, p. 2554. Similar considerations were a motivating factor in the *Sheffield* and *Dougherty County* cases. The Court observed that exempting municipalities from section 5 "would invite States to circumvent the Act . . . by allowing local entities that do not conduct voter registration to control critical aspects of the electoral process." *Sheffield, supra,* 435 U.S. at 125, 98 S.Ct. at

976; *accord, Dougherty County, supra,* 99 S.Ct. at 375.

In sum, then, we conclude that despite any logical inference that might be drawn from *Sheffield*, the reasoning of that case coupled with the legislative history and overarching purposes of the Voting Rights Act compel the conclusion that political subunits of a covered state cannot independently bring a section 4(a) bail-out action.

### III

#### A.

■ The City next argues that certain of its election rules, namely the majority vote, runoff election, and numbered post provisions, have in fact already been precleared by the Attorney General. As we have noted, *see* text accompanying notes 3–11 *supra*, these provisions were adopted as part of Rome's Charter in 1966. In 1968, the State of Georgia enacted a comprehensive Municipal Election Code (1968 Code), submitted it to the Attorney General, and obtained preclearance thereof. Rome argues that the Attorney General, in preclearing the 1968 Code, thereby approved by reference the City's 1966 Charter amendments.

The 1968 Code provided that if a municipality's charter or ordinance, "as now existing or as amended subsequent to the effective date of this subsection," called for plurality voting, that provision would be effective. If the local legislation did not call for plurality voting, the 1968 Code required majority voting and runoff elections.[57]

---

56. Although a covered state would have to submit for § 5 preclearance any legislation transferring voting authority to local jurisdictions, we do not believe that this requirement is sufficient to prevent circumvention of the Act. For one thing, to the extent that a political subunit possesses authority under existing state law to implement potentially discriminatory voting changes, no § 5 preclearance would be required of the state. *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). Secondly, even when a § 5 submission is required, it is likely that the Attorney General or this Court would grant preclearance because a transfer of voting authority is non-discriminatory on its face.

57. With respect to majority voting, the 1968 Code provided in pertinent part:

> If the municipal charter or ordinance, as now existing or as amended subsequent to the effective date of this Subsection, provides that a candidate may be nominated or elected by a plurality of the votes cast . . ., such provision shall prevail. Otherwise, no candidate shall be nominated for public office in any primary or elected to public office in any election unless such candidate shall have received a majority of the votes cast . . . .

Ga.Code § 34A–1407(a).

With respect to runoff elections, the 1968 Code provided, in pertinent part

Rome argues that its Charter, having been amended in 1966 to provide for majority voting, did not provide for plurality voting in 1968, and that therefore the 1968 Code mandated majority voting and runoff elections. Similarly, the 1968 Code provided that "charter or ordinance provisions now in effect or hereinafter enacted shall govern" whether numbered posts would be used.[58] Rome urges that because the Charter provision "in effect" in 1968 was the 1966 amendment creating numbered posts, the 1968 Code imposed or ratified a numbered post requirement. Therefore, in Rome's view, the granting of preclearance to the 1968 Code constituted preclearance to the majority vote, numbered post and runoff election provisions of the City Charter.

The Supreme Court has twice addressed the question of what constitutes a "submission" of a voting change for purposes of section 5. In *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), it rejected the argument that a submission occurred whenever the Attorney General became aware of a particular state enactment. In the Court's view, it was necessary that the submitting jurisdiction "in some unambiguous and recordable manner submit any legislation or regulation in question directly to the Attorney General with a request for his consideration pursuant to the Act." 393 U.S. at 571, 89 S.Ct. at 834. In *Sheffield, supra*, the Attorney General precleared a city's proposal to hold a referendum on the question of whether to switch from a commission to a mayor-council form of government. He objected, however, to the result of the referendum, in which the voters approved the proposed change. The Court rejected the argument that in approving the referendum the Attorney General also approved the change in form of government, stating that "the purposes of the Act would plainly be subverted if the Attorney General could ever be deemed to have approved a voting change when the proposal was neither properly submitted nor in fact evaluated by him." 435 U.S. at 136, 98 S.Ct. at 982.

We think *Allen* and *Sheffield* compel rejection of the City's theory. Georgia, in our view, submitted to the Attorney General only its decision to defer to local charters and ordinances regarding majority voting, runoff elections, and numbered posts, and, possibly, its expression of a general policy in favor of majority voting. It did not, however, submit in an "unambiguous and recordable manner" all municipal charter provisions, as written in 1968 or as amended thereafter, regarding these issues. To be sure, the Attorney General could have inferred from the submission that some municipalities had recently adopted or planned to adopt such rules. But the Court in *Sheffield* rejected the theory that voting changes are to be deemed submitted merely because an earlier submission renders the occurrence of these changes very likely. Just as in *Sheffield* the submission of a decision to hold a referendum did not incorporate by reference the results of that referendum, so, here, submission of state laws authorizing municipalities to adopt certain provisions in their charters does not constitute submission of the actual exercise of this authority by local governments. We might add, finally, that Rome has even less claim to have submitted its voting changes than did the litigants in *Allen* and *Sheffield,* since in the earlier cases the Attorney General was at least made aware of the changes at issue, whereas here, due to Rome's delay in submitting its 1966 Charter amendments, the Attorney General had

In instances where no candidate receives a majority of the votes cast and the municipal charter or ordinance does not provide for nomination or election by plurality vote, a runoff primary or election shall be held, between the two candidates receiving the highest number of votes.

*Id.* § 34A–1407(b).

**58.** The 1968 Code provided, in pertinent part:

In the case of a candidate seeking one of two or more public offices each having the same title and to be filled at the same election by the vote of the same electors, charter or ordinance provisions now in effect or hereinafter enacted shall govern whether such candidate shall designate the specific office he is seeking.

Ga.Code § 34A–902.

never been given notice, as of 1968, that these changes had even taken place.[59]

### B.

■ The City raises a second argument that its voting changes have been administratively precleared, this time focusing on the Attorney General's actions in 1976. Rome sought reconsideration of the Attorney General's objection to its electoral changes and annexations on May 24, 1976. On July 14, 1976, before the Attorney General had responded, the City supplemented its request with two additional affidavits. On August 12, 1976, the Attorney General declined to withdraw his objection.[60]

The Attorney General has by regulation provided that requests for reconsideration shall be acted upon within 60 days of their receipt. 28 C.F.R. § 51.3(d) (1978).[61] *See generally Georgia v. United States,* 411 U.S. 526, 536–41, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973). Rome computes the 60 days as running continuously from May 24, the date of the initial request for reconsideration, in which case the period would have expired prior to the Attorney General's response on August 12. The Government, on the other hand, computes the period as running from July 14, the date Rome supplemented its request, in which case the response was timely.[62]

We agree with the Government that the time period commenced anew when Rome supplemented its request on July 14. In the analogous situation of an original submission, the Government has the power to request additional information and, in its unreviewable discretion, *Morris v. Gressette,* 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977), to delay commencement of the 60-day period until the information is received if it believes the initial submission is unsatisfactory. 28 C.F.R. § 51.18(a).[63] When additional information is supplied at the initiation of the submitting jurisdiction rather than the Government, there is even more reason to view the period as commencing anew from the time of receipt.[64]

---

**59.** Because we hold that Rome's election changes were never "submitted" to the Attorney General in 1968, we find it unnecessary to reach the Government's argument that the changes were not precleared because, not having been submitted for preclearance immediately after their adoption in 1966 as required by the Act, they were unenforceable and, in effect, void as of the date the Georgia Municipal Election Code was submitted.

**60.** Second Supplement to Parties' Stipulation of Facts, Ex. 45.

**61.** This section provides:
When the Attorney General objects to a submitted change affecting voting, and the submitting authority seeking reconsideration of the objection brings additional information to the attention of the Attorney General, the Attorney General shall decide within 60 days of receipt of a request for reconsideration (provided that he shall have at least 15 days following a conference held at the submitting authority's request) whether to withdraw or to continue his objection.

**62.** The Government also contends that the 60-day period of § 51.3(d) is merely a goal rather than a binding commitment. While we need not decide this issue here, we do note that the language of § 51.3(d) is mandatory rather than permissive and that it tracks the time requirement for responses to initial submissions, which is statutorily binding on the Attorney General. *See also* note 63 *infra.*

**63.** The City stresses the proviso in § 51.13(d), *see* note 61 *supra,* tolling the period for at least 15 days following a conference held at the submitting authority's request. We agree that this proviso supports the argument that the 60-day period is binding on the Government, *see* note 62 *supra,* because if the period were merely advisory, the Government would not have felt the need explicitly to exempt itself in one special situation. We do not find, however, that this proviso is the *exclusive* means of tolling the period. Because the regulations are silent on the effect of supplements to requests for reconsideration, we are free to treat this situation in the way that most comports with the purposes of the Act and its implementing regulations.

Further, we do not find that the City's submission of additional affidavits constituted a "conference" within the meaning of the proviso.

**64.** If we were empowered to review the merits of the Attorney General's decisions under § 5, we might be inclined to find that he had ample opportunity to respond within 60 days of the initial submission. The City's brief supplemental affidavits were hardly of a nature to impose a significant additional burden on the Attorney General. However, under the teachings of

We conclude, therefore, that the Attorney General has not precleared the voting changes at issue in this case.[65]

## IV

The plaintiffs next raise a congeries of arguments challenging the constitutionality of section 5 of the Voting Rights Act. They attack that section as being (1) beyond the power of Congress under the Fifteenth Amendment; (2) an infringement of the rights reserved to the states under the Tenth Amendment; (3) a violation of the Guarantee Clause; and (4) an infringement of the rights of the private plaintiffs under various constitutional provisions.

We are bound to note, at the outset, that in asking this Court to declare section 5 unconstitutional, the plaintiffs summon us to a life of high adventure. For we could not do as the plaintiffs ask without overruling or ignoring unequivocal and repeated holdings by the Supreme Court of the United States. In *South Carolina v. Katzenbach,* the Court held that section 5, together with certain other provisions of the Act, is "an appropriate means for carrying out Congress' constitutional responsibilities and [is] *consonant with all other provisions of the Constitution.*" 383 U.S. 301, 308, 86 S.Ct. 803, 808 (1966) (emphasis supplied). Far from backing away from *Katzenbach,* the Court has in the ensuing years often cited that case with approval. *See United Jewish Organizations v. Carey,* 430 U.S 144, 157, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) (plurality opinion); *id.* at 180 n. *, 97 S.Ct. at 1017 (Stewart, J., concurring in the judgment); *Beer v. United States,* 425 U.S. 130, 133, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *Georgia v. United States,* 411 U.S. 526, 535, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *Allen v. State Board of Elections,* 393 U.S. 544, 548, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). *Ac-*

cord, *Wilkes County v. United States,* 450 F.Supp. 1171, 1177 (D.D.C.), aff'd, 439 U.S. 999, 99 S.Ct. 606, 58 L.Ed.2d 674 (1978).

It is true, as plaintiffs point out, that this impressive line of cases has not been without an undercurrent of dissent or at least unrest. Justice Black, the only member of the Court not to join the opinion in *Katzenbach,* believed that section 5's preclearance procedure "so distorts our constitutional structure of government as to render any distinction drawn in the Constitution between state and federal power almost meaningless." *Katzenbach, supra,* 383 U.S. at 358, 86 S.Ct. at 834 (Black, J., concurring and dissenting); *see also Allen, supra,* 393 U.S. at 595–97, 89 S.Ct. 817 (Black, J., dissenting); *Perkins v. Matthews,* 400 U.S. 379, 401–07, 91 S.Ct. 431, 27 L.Ed.2d 476 (Black, J., dissenting). Other Justices have also expressed misgivings. *See Georgia v. United States, supra,* 411 U.S. at 545, 93 S.Ct. 1702 (Powell, J., dissenting); *Holt v. City of Richmond,* 406 U.S. 903, 92 S.Ct. 1602, 31 L.Ed.2d 814 (1972) (Burger, C. J., concurring); *Allen, supra,* 393 U.S. at 586 & n.4, 89 S.Ct. 817 (Harlan, J., concurring and dissenting).

Further, it is undeniably true, as plaintiffs urge, that the constitutional climate has changed considerably since the *Katzenbach* decision. Of particular relevance to the present case, the Supreme Court in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), revivified the principles of federalism embodied in the Tenth Amendment. Federalism concerns have also played a prominent role in other recent cases, *e. g., Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). And in a separate line of cases, the Court

---

*Briscoe v. Bell,* 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977) and *Morris v. Gressette,* 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977), we are unwilling to second-guess the Attorney General on an issue implicating his unreviewable judgment of the merits of a § 5 application.

**65.** We cannot help observing, too, that the City's hands are not scrupulously clean when it

comes to timeliness. Rome took nearly a decade to submit any of its voting changes to the Attorney General. When asked for further information, it waited nearly seven months to respond. And it took more than a year to complete its submission after first setting the process in motion. *See* note 44 and accompanying text *supra.*

has held that the equal protection components of the Fifth and Fourteenth Amendments condemn only purposeful discrimination, not actions discriminatory in effect but not in intent. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1976); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Plaintiffs argue that, were the Court to reconsider the constitutionality of section 5 in light of these other cases, it would strike that provision down.

As a federal District Court, however, we should be slow indeed to disobey an explicit command of the Supreme Court absent compelling indications that the Court has now changed its mind. And we do not find such indications in the present case. To the contrary, our best estimate is that, were the Court writing on a clean slate today, it would affirm the constitutionality of section 5 much as it did in *Katzenbach* 13 years ago.

■ Before reaching the merits, however, we must dispose of a question going to our jurisdiction which, although not raised by the parties, we are obligated to decide *sua sponte.* The jurisdiction of this 3-judge District Court is established, for present purposes, in section 5 of the Act.[66] The cause of action over which jurisdiction is in terms conferred by section 5 is restricted to preclearance actions, and the only parties explicitly authorized to bring such actions are covered jurisdictions. The claims we consider in the present section are, however, constitutional challenges to the Act, some

of them brought by private parties rather than the City. We are doubtful that this Court has statutory jurisdiction over such claims.[67]

Despite these doubts, we find we can take jurisdiction over the claims on a pendent jurisdiction theory. The constitutional and Voting Rights Act claims arise from a "common nucleus of operative fact," *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), and the interests of judicial efficiency call for their resolution in a single proceeding. Moreover, we do not perceive in section 5 any congressional intent to preclude our taking jurisdiction either over the City's constitutional assertions or over the claims of the private plaintiffs as to whom Congress has not extended the section 5 cause of action.[68] *See Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978); *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). We therefore see no reason not to take jurisdiction over all the constitutional claims.

### A.

■ Plaintiffs first argue that Congress simply had no power to prevent a state or local jurisdiction from implementing voting changes which, although not motivated by racial animus, nevertheless have the effect of diluting black voting strength.[69] Section 5 of the Voting Rights Act in terms requires a covered jurisdiction to demonstrate the absence of discrimination both in purpose and in effect. *See* note 43 *supra.* However, the Fifteenth Amendment, which

---

**66.** Section 4(a) also grants this Court jurisdiction to hear bail-out actions such as that brought by the City as part of this lawsuit. Section 4(a), however, obviously does not grant jurisdiction over challenges to the constitutionality of § 5.

**67.** It may be, of course, that a single-judge federal District Court would have jurisdiction to consider these claims under some other provision, such as 28 U.S.C. § 1331.

**68.** Although the City of Rome purports to bring suit as the *parens patriae* of its private citizens, it has been settled since *South Carolina v. Katzenbach, supra,* 383 U.S. at 324, 86 S.Ct. 803,

that no state or municipal government can sue the federal government in a *parens patriae* capacity. The claims of the private parties must therefore be viewed as brought in their individual capacities only.

**69.** We would, of course, have no occasion to reach this issue were we to find that all the voting changes in question resulted from purposeful discrimination. As we discuss in Part V, however, we conclude that these changes are discriminatory in effect but not in purpose. Rome's argument is thus squarely presented for decision on the facts of this case.

is the source of Congress' power to enact section 5,[70] in plaintiffs' view outlaws only *purposeful* discrimination. Therefore, they argue, Congress acted beyond its constitutional powers insofar as it purported to proscribe voting changes discriminatory in *effect* only.[71]

Whether the Fifteenth Amendment reaches only purposeful discrimination is an important and unsettled constitutional question. The Supreme Court, in *Arlington Heights* and *Washington v. Davis, supra,* may have intimated an answer when it held that the equal protection components of the Fifth and Fourteenth Amendments reach only purposeful discrimination.[72] A panel of the Fifth Circuit has recently held, largely on the basis of these cases, that the Fifteenth Amendment reaches only purposeful discrimination. *Nevett v. Sides,* 571 F.2d 209 (5th Cir. 1978). The Supreme Court, however, has never explicitly addressed the question.[73] And as Judge Wisdom pointed out, specially concurring in *Nevett, id.* at 231, despite their close historical connections there are important structural differences between the Amendments: the Fifteenth Amendment would not appear as firmly grounded on a core idea of intentional discrimination and, being far more restricted in scope, does not present as compelling a case for a limited construction.

Moreover, as Judge Wisdom noted, the special character of the franchise, which is "a fundamental political right, because preservative of all rights," *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886), may serve to distinguish it from the panoply of other constitutional rights protected by the Fourteenth Amendment.

We need not decide this question here, however, because even assuming, *arguendo,* that the Fifteenth Amendment reaches only purposeful discrimination, we find that Congress was within its broad enforcement power under section 2 thereof when it outlawed voting changes discriminatory in effect only. Chief Justice Warren emphasized the sweeping nature of this power in *South Carolina v. Katzenbach, supra,* 383 U.S. at 327, 86 S.Ct. at 818, when he quoted with approval the following broad statement in *Ex parte Virginia,* 100 U.S. 339, 345–46, 25 L.Ed. 676 (1879):

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion,

**70.** Congress undoubtedly intended to exercise its Fifteenth Amendment powers in enacting § 5. *E.g., South Carolina v. Katzenbach, supra,* 383 U.S. at 308, 86 S.Ct. 803. It is not certain whether § 5 could be sustained under some other constitutional power. *Compare Allen v. State Bd. of Elections,* 393 U.S. at 588–89, 89 S.Ct. 817 (Harlan, J., concurring and dissenting) *with Katzenbach v. Morgan,* 384 U.S. 641, 646–47 n.5, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). In light of our holding herein, we do not address the latter question.

**71.** Section 5 goes beyond the Fifteenth Amendment in another sense also. While in litigation brought directly under the Fifteenth Amendment the burden is on the party challenging a voting practice to show discrimination, under § 5 the burden shifts to the practice's proponent to show the absence of discrimination. *South Carolina v. Katzenbach, supra,* 383 U.S. at 335, 86 S.Ct. 803; cases cited at note 80 *infra.* Plaintiffs do not challenge this shifting of the burden of proof.

**72.** *See also Duren v. Missouri,* 439 U.S. 357, 368, 99 S.Ct. 664, 670 n.26, 58 L.Ed.2d 579 (1979) (dictum that *both* purpose *and* effect are necessary to an equal protection violation). *Cf. Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (first amendment).

**73.** Justice Marshall, dissenting in *Beer v. United States, supra,* 425 U.S. at 148–149 n.4, 96 S.Ct. at 1367 n.4, identified three possible approaches to the purpose/effect question, each one of which, as he read the cases, has been adopted by the Court at one time or another in recent years:

> The possible theoretical approaches are three: (1) purpose alone is the test of unconstitutionality, and effect is irrelevant, or relevant only insofar as it sheds light on purpose; (2) effect alone is the test, and purpose is irrelevant; and (3) purpose or effect, either alone or in combination, is sufficient to show unconstitutionality.

if not prohibited, is brought within the domain of congressional power.

As the Chief Justice noted, this language echoes the classic formulation of congressional power under the Necessary and Proper Clause:

Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

*McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

Under this standard, we have no doubt but that section 5's ban on "effect" discrimination is an appropriate means even if it is assumed that the desired end is solely the elimination of purposeful discrimination. For one thing, discriminatory effects raise a legitimate, and often compelling, inference of purpose. The Court recognized this fact in *Washington, supra* :

Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is not infrequently true that the discriminatory impact . . . may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds.

426 U.S at 242, 96 S.Ct. at 2048–2049. *Accord, Arlington Heights, supra,* 429 U.S. at 264–66, 97 S.Ct. 555.

While the inference of invidious purpose would be a legitimate one in any case, it is especially strong in the case of the Voting Rights Act. Congress, in its investigation preceding passage of the Act, found that pervasive purposeful voting discrimination existed in various parts of the country, particularly in the Southern states. The Act's coverage formula, *see* note 53 *supra,* was designed to identify those states or subjurisdictions that were most likely to have engaged in a pattern of invidious discrimination. *South Carolina v. Katzenbach, su-*

*pra,* 383 U.S. at 329–30, 86 S.Ct. 803. Thus, congressional fact finding, to which we are inclined to pay great deference, *Katzenbach v. Morgan,* 384 U.S. 641, 656, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), strengthens the inference that, in those jurisdictions covered by the Act, state actions discriminatory in effect are discriminatory in purpose also.

The means of banning "effect" discrimination is well adapted to the end of eliminating purposeful discrimination in another sense also. Congress found as a fact that many of the jurisdictions subject to the Act had taken various actions designed to nullify the effect of adverse federal court decrees. As explained in *South Carolina v. Katzenbach, supra:*

Even when favorable decisions have finally been obtained, some of the states affected have merely switched to discriminatory devices not covered by the federal decrees or have enacted difficult new tests designed to prolong the existing disparity between white and Negro registration. Alternatively, certain local officials have defied and evaded court orders or have simply closed their registration offices to freeze the voting rolls.

383 U.S. at 314, 86 S.Ct. at 811 (footnotes omitted).

As jurisdictions became increasingly sophisticated at evading the strictures of federal decrees, they frequently adopted tactics characterized by superficial racial neutrality. *See S.Rep. supra,* at 5, *H.R.Rep., supra,* at 8. Given the frequent lack of state legislative histories and the unreliability of other means of ascertaining legislative intent, Congress could well have concluded that wholesale evasion of the Act was likely unless discriminatory effects could be taken as conclusive evidence of purpose. Such a conclusion would comport with Congress's broad tactic, in the Voting Rights Act, of "shift[ing] the advantage of time and inertia from the perpetrators of the evil to its victims." *South Carolina v. Katzenbach, supra,* 383 U.S. at 328, 86 S.Ct. at 818.

Viewed most narrowly, then, section 5 of the Act simply represents an exercise by

Congress, based on facts found during an exhaustive investigation, of its power to establish standards of proof for facts which are admittedly Fifteenth Amendment violations. In effect, Congress can be said to have instructed the courts that the existence of racially disproportionate impact raises an irrebuttable presumption of invidious purpose. We can see no constitutional impediment to Congress' taking such an approach. *See South Carolina v. Katzenbach, supra,* 383 U.S. at 330, 86 S.Ct. 803.

This conclusion finds support in the Court's treatment of the Voting Rights Act's ban on literacy tests and other voter qualifications. In *Lassiter v. Northampton County Board of Elections,* 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), a case decided prior to enactment of the Voting Rights Act, the Court held that literacy tests and related devices were not *per se* violative of the Fifteenth Amendment, although "[o]f course a literacy test, fair on its face, may be employed to perpetuate that discrimination which the Fifteenth Amendment was designed to uproot." *Id.* at 53, 79 S.Ct. at 991. Without disavowing *Lassiter,* the Court in *South Carolina v. Katzenbach, supra,* held that Congress had power to suspend the operation of such tests within jurisdictions subject to the Act. And in *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), the Court unanimously upheld Congress' subsequent suspension of literacy tests on a nationwide basis. These cases, we think, present a substantial analogy to the present challenge. In *Lassiter,* the Court in effect held that although use of a literacy test does not *per se* contravene the Fifteenth Amendment, it at least raises a legitimate inference of such a violation. In the Voting Rights Act, Congress could be said to have created an irrebuttable presumption, based on extensive legislative fact finding, that use of a literacy test established the existence of a constitutional violation. The Court's upholding of this presumption in *South Carolina v. Katzenbach* and *Oregon v. Mitchell* is strong evidence that the presumption established by section 5 of the Act—that invidious purpose is to be presumed given the existence of disproportionate impact—would also be upheld.[74]

## B.

◼ Plaintiffs' second constitutional argument is that, even if Congress otherwise had the power to enact section 5, we must nevertheless strike that provision down, under the rule of the *National League of Cities* opinion, as invading the protected sphere of traditional state autonomy. Plaintiffs' argument, in our view, reads far too much into *National League of Cities.* The Court in that case held that Congress could not, consistently with principles of federalism embodied in the Tenth Amendment, exercise its power under the Commerce Clause to extend minimum wage and maximum hour regulations to employees of state and local governments. Despite the seeming breadth of the federalism principle articulated, the Court was at pains to limit its holding to Commerce Clause regulations and, significantly, expressed no view as to "whether different results might obtain if Congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such as . . . § 5 of the Fourteenth Amendment." 426 U.S. at 852 n.17, 96 S.Ct. at 2474 n.17. In reserving this question, the Court also implicitly left

---

**74.** In light of this disposition, we need not inquire whether, still assuming that the Fifteenth Amendment of its own force reaches purpose only, Congress has the power under *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), to extend the substantive content of Fifteenth Amendment protections so as to proscribe voting discrimination in effect as well as in purpose.

A similar issue arises in the context of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e, et seq., which forbids "effect" discrimination in employment matters, *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), although the Fourteenth Amendment, which together with the Commerce Clause was the basis for congressional power to enact Title VII, reaches of its own force only purposeful discrimination. *See* Note, *Title VII and Public Employers: Did Congress Exceed its Powers?* 78 Colum.L.Rev. 372 (1978).

undecided the issue in the present case of whether, or to what extent, the *National League of Cities* principle places limits on congressional action pursuant to the enforcement power in section 2 of the Fifteenth Amendment.

The Court gave very strong indications of how it would resolve the latter question in *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), a case decided just four days after *National League of Cities* and also written by Justice Rehnquist. The question in *Fitzpatrick* was whether, against the shield of the Eleventh Amendment, Congress had power to authorize an award of retroactive monetary relief against the states as a means of enforcing the Fourteenth Amendment. The Court's answer was unequivocal:

> [W]e think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, . . . are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority. We think that Congress may, in determining what is "appropriate legislation" for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are consti-

tutionally impermissible in other contexts.

*Id.* at 456, 96 S.Ct. at 2671.[75]

Although *Fitzpatrick* did not directly address the question presented here, we find that analytically it compels a like result. To be sure, the case arose under the Fourteenth Amendment rather than the Fifteenth; but these Amendments share a common history and both have explicit enforcement provisions. The Court in *Fitzpatrick* strongly hinted that the analysis would be the same in both cases. Citing *Katzenbach,*[76] the Court observed that it has

> sanctioned intrusions by Congress, acting under the Civil War Amendments, into the judicial, executive, and legislative spheres of autonomy previously reserved to the States. The legislation considered in each case was grounded on the expansion of Congress' powers—with the corresponding diminution of state sovereignty—found to be intended by the Framers and made part of the Constitution upon the States' ratification of those Amendments, a phenomenon aptly described as a "carving out" . . . . .

*Id.* at 455–56, 96 S.Ct. at 2671, *quoting Ex parte Virginia,* 100 U.S. 339, 346, 25 L.Ed. 676 (1880). We are also aware that *Fitzpatrick* involved the Eleventh rather than the Tenth Amendment. Again, however, these amendments share a common grounding in *"principle[s] of state sovereignty,"* 427 U.S. at 456, 96 S.Ct. 2666 (emphasis supplied), and we see no reason to suppose that in this context the states' Tenth Amendment immunities should be significantly broader than those under the Eleventh Amendment. The short of it is, as the Court stated in *Katzenbach,*

> As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional

---

**75.** This analysis was followed in *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), upholding the Civil Rights Attorney's Fees Awards Act of 1976 against the claim that it infringed the states' Eleventh Amendment immunity.

**76.** This citation is of particular relevance because the primary constitutional challenge to the Voting Rights Act provisions in *Katzenbach* was based on the Tenth Amendment, *i. e.,* "that they exceed the powers of Congress and encroach on an area reserved to the States by the Constitution." 383 U.S. at 323, 86 S.Ct. at 816.

prohibition of racial discrimination in voting. . . . *The gist of the matter is that the Fifteenth Amendment supersedes contrary exertions of state power.* 383 U.S. at 324, 325, 86 S.Ct. at 816–817 (emphasis supplied).

The only remaining question, then, is whether section 5 of the Act is an "appropriate" means of enforcing the Fifteenth Amendment. As the Court has frequently noted, the section 5 requirement that state and local governments submit changes in their laws affecting voting to the Attorney General is an "unusual, . . . in some aspects a severe, procedure," *Allen, supra,* 393 U.S. at 556, 89 S.Ct. at 827, and a "stern and powerful remedy," *Briscoe v. Bell, supra,* 432 U.S. at 410, 97 S.Ct. 2428. The function of section 5 is in effect to freeze the electoral processes of a covered jurisdiction until the necessary preclearance is obtained. In so providing, "Congress was well aware of the extraordinary effect the Act might have on federal-state relationships and the orderly operation of state government." *Allen, supra,* 393 U.S. at 563, 89 S.Ct. at 830. Nevertheless, Congress made a considered judgment that this extraordinary procedure was necessary to remedy the systematic evasion of the Fifteenth Amendment that had hitherto been occurring. The Court upheld the appropriateness of this congressional judgment in *Katzenbach,* and has never since questioned or otherwise undermined this holding.[77] We conclude, therefore, that section 5 of the Act is entirely consistent with the principles of federalism as embodied in the Tenth Amendment and articulated in *National League of Cities.*

### C.

■ We need not reach the merits of plaintiffs' contention that section 5 consti-

tutes a violation of the Guarantee Clause,[78] since it has long been settled that such issues are generally not justiciable in federal court. *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Luther v. Borden,* 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849). We are bound to note, moreover, that section 5 would appear to be, if anything, an affirmative exercise of Congress' power under that provision rather than an abrogation of its duty. The purpose of section 5, simply speaking, is to guarantee to the covered jurisdiction one essential feature of a truly republican form of government—*i.e.,* the equal right of any citizen, irrespective of race or color, to exercise the franchise. *See S.Rep., supra,* at 34.

### D.

■ The private plaintiffs claim that, allegedly as a result of the operation of section 5, regularly scheduled elections have not been held in Rome since 1974 and cannot be held at least until the completion of this litigation. The private plaintiffs assert that as a result of their inability to vote in municipal elections, they have been deprived of certain rights guaranteed under various provisions of the Constitution.

We note, at the outset, that the damage complained of by the private plaintiffs is at least as much the result of the actions of Rome's elected officials as of the Voting Rights Act. It would appear that, because the Attorney General has precleared the reduction in wards from 9 to 3 but has not precleared certain other voting changes, the City Charter as presently effective contains inconsistencies that would make an election technically infeasible. The Attorney General, however, has made known his willing-

---

**77.** Plaintiffs claim that, as a result of the operation of § 5, no elections have taken place in Rome since 1974. We have some doubt as to whether the sole responsibility for the freezing of elections in Rome rests with the operation of § 5, or whether, on the contrary, the present City officials do not bear a share of the blame. *See* text accompanying note 79 *infra.* In any event, a 5-year suspension of elections during § 5 litigation is by no means unusual. When

the Supreme Court decided *Beer v. United States, supra,* elections had been frozen for six years, while in *City of Richmond v. United States, supra,* the Court remanded to the District Court for further factfinding a case in which elections had already been frozen for 5 years.

**78.** U.S.Const., Art. IV, § 4.

ness to permit elections on the pre-existing at-large and plurality-win system.[79] Doubtless, the Attorney General would readily preclear any technical amendments to the City Charter necessary to permit the holding of elections and effective operation of the City government. It would not appear that the City has even discussed this possibility with the Attorney General.

Even if we agreed that the injuries complained of result from operation of the Voting Rights Act, we would find little merit to the plaintiffs' arguments. We need not decide whether the right to vote in a municipal election when that election is regularly scheduled can ever be deemed a fundamental right protected by the Constitution. For even if fundamental interests were at stake, we believe section 5 of the Act is justifiable as advancing the compelling national interest of enforcing the Fifteenth Amendment by "eras[ing] the blight of racial discrimination in voting." *Sheffield, supra*, 435 U.S. at 118, 98 S.Ct. at 972, *quoting South Carolina v. Katzenbach, supra*, 383 U.S. at 308, 86 S.Ct. 803. Moreover, the means chosen in section 5 were narrowly tailored to advancing this interest. To be sure, the preclearance procedure, as Congress recognized, is a stringent and even drastic measure. But Congress chose to adopt this procedure because in its considered judgment nothing less would effectively combat the pervasive evil of discrimination in voting. In the words of Chief Justice Warren:

> Two points emerge vividly from the voluminous legislative history of the Act contained in the committee hearings and floor debates. First: Congress felt itself confronted by an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution. Second: Congress concluded that the unsuccessful remedies which it had prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment. *South Carolina v. Katzenbach, supra*, 383 U.S. at 309, 86 S.Ct. at 808.

We note, too, that Congress adopted a number of measures designed to mitigate what it recognized to be the potentially harsh operation of section 5. Thus, states or separately covered political subdivisions are permitted to bail-out from section 5's coverage under section 4(a) of the Act. *See* Part II *supra*. Moreover, Congress provided jurisdictions the alternative of submitting their voting changes for approval to the Attorney General rather than to this Court. The administrative preclearance mechanism was intended to be, and has in fact operated as, a non-burdensome procedure by which the vast proportion of voting changes are approved within a brief period. Further, Congress provided that, should litigation occur, it was to take place before a 3-judge District Court with direct appeal to the Supreme Court, thus giving the plaintiff jurisdiction the advantages of plenary consideration at the trial level together with quick access as of right to the Supreme Court without the burden of passing through an intermediate appellate stage.

In light of the foregoing considerations, we find that none of plaintiffs' constitutional challenges to section 5 of the Act has merit. We therefore decline the suggestion to depart from the Supreme Court's explicit statement that section 5 is constitutional "with all . . . provisions of the Constitution." *South Carolina v. Katzenbach, supra*, 383 U.S. at 308, 86 S.Ct. at 808.

## V

Finally, we come to the basic issue for decision in any section 5 case, *i. e.*, whether the plaintiff jurisdiction has carried its burden of showing that the voting changes at issue had neither the purpose nor the effect of denying or abridging the right to vote on account of race or color.[80] This determina-

---

79. Defendants' Response to Plaintiffs' Motion for Interim Relief, at 5.

80. It is well established that the § 5 plaintiff has the burden of demonstrating both lack of invidious purpose *and* absence of discriminatory effect. *Beer v. United States*, 425 U.S. 130, 140–41, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *Georgia v. United States*, 411 U.S. 526, 538, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973); *South Caro-*

tion requires us to make findings, as requested by the parties, of disputed issues of material fact. Thus, our decision as to this question is more properly styled a final judgment on the basis of the stipulated record rather than a summary judgment.

### A.

Although the issue is a close one, we conclude that the City has carried its burden of showing that its non-annexation voting changes were not enacted with a discriminatory purpose. It is, of course, grounds for suspicion that these provisions were adopted so soon after passage of the Voting Rights Act. The "specific sequence of events leading up to the challenged decision," *Arlington Heights, supra,* 429 U.S. at 267, 97 S.Ct. at 564, is obviously important evidence from which an invidious purpose can be inferred. Moreover, as we discuss below, the provisions adopted are typical of those generally thought to be aimed at preventing the black community's maximizing its voting strength through "single-shot" voting. *See* note 95 and accompanying text *infra.* Finally, although the then-City Attorney, Mr. Clary, testified that he recommended the switch to majority voting in order to comply with the Georgia Election Code of 1964,[81] the record demonstrates that the 1964 law did not in fact apply to municipal elections.[82]

The City, however, has adequately rebutted these inferences through the testimony and affidavits of many of those who played a part in the adoption of the 1966 City Charter amendments. These amendments were recommended to the Commission by Mr. Clary. The Commission, presumably after consultation with the City Manager, requested the local representatives to the State legislature to introduce the proposed amendments as local legislation. The representatives complied with the request, and the Georgia General Assembly proceeded to enact the Charter amendments as introduced. The City has obtained the sworn statements of participants at every stage in this process—the City Attorney,[83] five Commissioners,[84] the City Manager,[85] and the local representatives to the State legislature [86]—to the effect that their actions were not motivated by any consideration of race or color. Although these officials may be "interested witnesses," *City of Richmond v. United States,* 422 U.S. 358, 377, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975), the unanimity of their sworn statements cannot be discounted. We are unwilling, particularly on the basis of a stipulated record, to question their credibility in this regard.

Thus, on the present record we accept the argument that the majority vote and associated runoff election and numbered posts [87] provisions were enacted primarily because of the City Attorney's mistaken belief that such a system was required under state law.

lina v. Katzenbach, 383 U.S. 301, 335, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); *Wilkes County v. United States,* 450 F.Supp. 1171, 1177–78 (D.D. C.), *aff'd,* 439 U.S. 999, 99 S.Ct. 606, 58 L.Ed.2d 674 (1978); *City of Petersburg v. United States,* 354 F.Supp. 1021, 1027–28 (D.D.C. 1972), *aff'd,* 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973).

81. Clary Deposition 54–55 & Ex. 1.

82. *See* Second Supplement to Parties' Stipulation of Facts, Ex. 44 ¶ IV at 2.

83. Clary Deposition 56.

84. Affidavits in Support of Plaintiffs' Motion for Summary Judgment of Grover C. Byars, S.

L. Hancock, Lucian Oldham, R. L. Starnes and John E. Yarmough.

85. Hamler Deposition 28, 116.

86. Affidavits in Support of Plaintiffs' Motion for Summary Judgment of J. Rattle Hall and Terry J. Minge.

87. The City Attorney testified that numbered posts were needed to facilitate the division of the Commission into committees. Clary Deposition 51–53. This objective could easily have been accomplished without numbered posts, however. A more likely explanation is that numbered posts were intended to make majority voting possible by conveniently dividing Commission and Board of Education elections into separate races.

Staggered terms were most likely adopted because City officials felt they would contribute to continuity in the City Government.[88] And the Board of Education residency requirement, we find, was enacted to ensure responsiveness by Board members to the particular concerns of their wards.[89]

We reach a different result, however, on the question of whether the City has met its burden of showing the absence of discriminatory *effects* from its non-annexation voting changes. With respect to the majority vote and runoff election provisions, the discriminatory effect is clear beyond peradventure. Under the plurality-win system, a black candidate in Rome would stand a good chance of election if the white citizens split their votes among numerous candidates and the black voters engaged in "single-shot" voting, *i.e.*, voted only for the candidate or candidates of their choice.[90] Under the majority vote/runoff election scheme, however, the black candidate, even if he gained a plurality of votes in the general election, would still have to face the runner-up white candidate in a head-to-

head runoff election in which, given bloc voting by race[91] and a white majority,[92] the black candidate would be at a severe disadvantage. Rev. Hill's Board of Education campaign exemplifies the dilutive effect on black voting strength of these rules: he would have been elected under the pre-1966 plurality-win system, but was defeated by the white candidate in the runoff election under the majority vote regime.[93]

The effects of the numbered posts, staggered terms, and Board of Education residency provisions are somewhat less clear. The Government has argued, in conclusory terms, that these rules have a discriminatory impact on black voting strength because such provisions "promote head-to-head contests between white and black candidates and deprive the black community of the opportunity to elect a candidate of their choice through single-shot voting."[94] Although the Government's conclusions are not inherently unreasonable and, at least with respect to single-shot voting, are supported by expert authority,[95] we could have

---

88. Clary Deposition 45–47; Hunter Deposition 11–13; Harvey Deposition 11–12.

89. See Clary Deposition 27–30, 36–39; Hamler Deposition 22–24; Harvey Deposition 10–11.

90. The United States Commission on Civil Rights has described single-shot voting as follows:

> Consider . . . the town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes. The black has probably won a seat. This technique is called single-shot voting. Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates.

U.S. Comm'n on Civil Rights, The Voting Rights Act: Ten Years After 206–07 (1975).

91. *See* text accompanying notes 37–42 *supra*.

92. *See* text accompanying note 1 *supra*.

93. *See* text accompanying note 41 *supra*.

94. Defendants' Proposed Findings of Fact and Conclusions of Law §§ 29, 30.

95. In the words of the U.S. Commission on Civil Rights,

> There are a number of voting rules which have the effect of frustrating single-shot voting . . . . [I]nstead of having one race for four positions, there could be four races, each for only one position. Thus for post no. 1 there might be one black candidate and one white, with the white winning. The situation would be the same for each post, or seat—a black candidate would always face a white in a head-to-head contest and would not be able to win. There would be no opportunity for single-shot voting. A black still might win if there were more than one white candidate for a post, but this possibility would be eliminated if there were also a majority requirement.
> [Second,] each council member might be required to live in a separate district but with voting still at large. This—just like numbered posts—separates one contest into a number of individual contests.
> [Third,] the terms of council members might be staggered. If each member has a 4-year term and one member is elected each year, then the opportunity for single-shot voting will never arise.

benefitted from citation of supporting studies from the statistical or political sciences. Nevertheless, the City has shown us nothing at all that might refute the Government's argument. In this situation we are bound to find that it has failed to satisfy its burden of demonstrating that numbered posts, staggered terms and the residency provision do not have the effect of discriminating on the basis of race or color.

### B.

The defendants concede that the thirteen contested annexations were not effected out of discriminatory purpose.[96] The only question, therefore, is whether the annexations had a discriminatory effect within the meaning of section 5.

Although annexations have long been held subject to the Voting Rights Act, *Perkins v. Matthews*, 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), they do present unusual considerations and require special judicial treatment. The problem, broadly stated, is that virtually any annexation will change the racial balance in the jurisdiction and thereby, in a sense dilute the voting power of a particular racial group. Application of a mechanistic test for voting dilution would require this Court to deny preclearance to practically all annexations, even those accomplished for compelling and non-discriminatory reasons of municipal finance, orderly growth, or provision of services. Such a result, as we recognized in *City of Petersburg v. United States*, 354 F.Supp. 1021, 1030 (D.D.C.1972), aff'd, 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973), could not be consonant with the intent of Congress when it enacted the Voting Rights Act. To the contrary, it is probable that Congress would have condoned even annexations that dramatically altered

racial balance so long as those annexations were not discriminatory in purpose and did not have the effect of perpetuating or reinforcing discriminatory effects stemming from the operation of other discriminatory voting rules.

The solution adopted in *City of Petersburg*, and subsequently endorsed by the Supreme Court, was to treat the voting practices under review in annexation cases as being, not the geographic extension of boundary lines, but rather the expansion of the particular voting system existing in the community at the time of the annexation.[97] It is not sufficient, under this doctrine, that an annexation significantly reduces the proportion of voters of a particular race; it is necessary also that the minority race must be denied the opportunity to obtain "representation reasonably equivalent to [its] political strength in the enlarged community." *United Jewish Organizations v. Carey*, 430 U.S. 144, 160, 97 S.Ct. 996, 1007, 51 L.Ed.2d 229 (1977), quoting *City of Richmond, supra*, 422 U.S. at 370–71, 95 S.Ct. 2296; accord, *City of Petersburg, supra*, 354 F.Supp. at 1030.

Additionally, this Court in *City of Petersburg* fashioned a remedial device, also subsequently endorsed by the Supreme Court, *City of Richmond, supra*, 422 U.S. at 369–370, 95 S.Ct. 2296, designed to ensure that annexations in violation of the above standard could nevertheless be accomplished as simply and rapidly as possible upon elimination of the offending features of a city's voting rules.[98] Although the Court denied preclearance to the contested annexation, it retained jurisdiction over the case and directed the plaintiff to "prepare a plan for conducting its city council elections in accordance with the requirements of the Voting Rights Act as interpreted by this Court . . . ." Judgment in *City of Peters-*

U.S. Comm'n on Civil Rights, *supra* note 90, at 207–08.

**96.** Defendant's Proposed Findings of Fact and Conclusions of Law ¶ 19.

**97.** "The Court concludes then, that this annexation, insofar as it is a mere boundary change and not an expansion of an at-large system, is not the kind of discriminatory change which

Congress sought to prevent . . . ." 354 F.Supp. at 1031.

**98.** The Court in *City of Petersburg* had no power to mandate reform in the rules themselves, apart from the annexations, because these rules had not been changed. *Cf. Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976).

*burg, supra, quoted in City of Richmond, supra,* 422 U.S. at 370, 95 S.Ct. at 2303. In effect, the Court conditioned approval of the annexation upon the City's amending its voting rules to comport with the legal standard articulated in that case.

Application of *City of Petersburg* and later cases requires us to determine (1) whether the annexations significantly altered the racial balance in Rome; and (2) if so, whether the post-annexation political system ensures the black community representation reasonably commensurate with its voting strength in the expanded City.

In addressing the first question, we will look at the annexations as of the date of the most recent information—information which reflects an effect on black voting strength considerably more pronounced than was the case when the annexations were initially implemented.[99] This approach comports with the terms of section 5, *quoted* in note 43 *supra,* which requires, in the future tense, that the plaintiff jurisdiction demonstrate that its voting changes *"will not"* have a discriminatory effect; it comports also with the fact that cities frequently annex relatively unpopulated areas

**99.** The following table indicates the racial composition, in the annexed areas, of the gross, voting age, and registered voter populations:

| Annexed Area | Population by Race At Annexation White–Black | February 1978 White–Black | Voting Age Population At Annexation White–Black | February 1978 White–Black | No. Registered Voters At Annexation White–Black | February 1978 White–Black |
|---|---|---|---|---|---|---|
| Saddle Mountain | 0    0 | 78    0 | 0    0 | 141    0 | 0    0 | 134    0 |
| Holmes Acres (E. 11th Ext.) | 144    0 | 263    0 | 95    0 | 174    0 | 31    0 | 98    0 |
| Lyons Drive West Rome | 78    3 | 315    28 | 51    1 | 208    16 | 8    0 | 35    6 |
| Georgian-Old Salem Apts. | 0    0 | 295    6 | 0    0 | 195    3 | 0    0 | 42    1 |
| Battey Hospital | 35    0 | 32    0 | 21    0 | 21    0 | 8    0 | 11    0 |
| Maplewood Square | 0    0 | 84    0 | 0    0 | 55    0 | 0    0 | 42    0 |
| Garden Lakes Rollingwood | 0    0 | 172    0 | 0    0 | 114    0 | 0    0 | 38    0 |
| Berkshire Estates | 0    0 | 112    0 | 0    0 | 74    0 | 0    0 | 61    0 |
| W. A. DuPre-Rockmart Rd. | 0    0 | 321    8 | 0    0 | 222    2 | 0    0 | 49    1 |
| Westminister Apts. Harry Butler | 0    0 | 220    10 | 0    0 | 138    3 | 0    0 | 49    1 |
| Castle Cove Subdivision | 0    0 | 95    0 | 0    0 | 63    0 | 0    0 | 14    0 |
| Saddle Mt., Sec. 4 Bill DuPre | 0    0 | 84    0 | 0    0 | 55    0 | 0    0 | 47    0 |
| Old Airport Community | 781    0 | 511    0 | 515    0 | 337    0 | 241    0 | 203    0 |
| TOTALS | 1,038    3 | 2,582    52 | 682    1 | 1,797    24 | 288    0 | 823    9 |

for purposes of future growth and development. Prior judicial opinions further teach that a court in Voting Rights Act cases should respond to the realities of a situation as they exist at the time of decision.[100]

Additionally, we will not treat these thirteen annexations as separate voting changes, in which case we would be compelled to sustain many of them as having *de minimis* effect only.[101] Instead, we view them as a single and unified whole. The reality is that these annexations, although effected separately, have an indivisible cumulative impact on black voting strength in Rome. We are also concerned lest the Act be frustrated through piecemeal changes which are insignificant when taken separately but of considerable moment when added together. Finally, viewing these annexations from the present perspective and as a unit is eminently fair in light of the fact that the reason for the delay and for our consideration of the annexations as a group was Rome's initial failure to comply with the Act by submitting them when they occurred.

Viewed in this manner, we find that the annexations in question significantly alter the racial balance in Rome. To be sure, the effect here is not as compelling as in *City of Petersburg* or *City of Richmond*, cases in which the annexations resulted in a shift from a black majority population to a white majority. But the effect in the present case is significant nonetheless. As of February, 1978, the annexed areas contained 2,582 whites, 823 of whom were registered to vote, and 52 blacks, only 9 of them registered. By comparison, in 1975 the registered voters in the City as a whole totalled 10,982 whites and 2,026 blacks.[102] Thus, it is fair to infer that presently close to 10% of the white voters, and virtually none of the black voters, reside in the annexed areas.

Because we find the impact on black voting strength to be significant, we must inquire further whether the black community, after the annexations, has a fair opportunity to obtain representation reasonably commensurate with its post-annexation numerical strength. Our answer would be clear if it were based on Rome's political system as presently instituted. In light of our findings as to the effect of the Charter amendments also at issue in this case, we have no doubt that a significant increase in the proportion of white voters perpetuates and reinforces the discriminatory effect of these voting rules. However, because of our findings and conclusions in this regard, Rome's legally effective electoral system operates under pre-1966 rules, *i. e.*, with plurality voting and without numbered posts, staggered terms, runoff elections or the Board of Education residency requirement. Whether the annexations have a discriminatory effect when viewed against this context is a far more difficult question.

Even under the pre-1966 rules, Rome's elections would be conducted at-large and, we presume, would be characterized by a high degree of racial bloc voting. These two factors were also present in *City of Petersburg, supra,* in which the Court found the annexation to have discriminatory effect and conditioned approval thereof on the city's abandonment of at-large voting in favor of elections by ward. If *City of Petersburg* is controlling here, we would have to deny preclearance of these annexations and condition our approval upon Rome's adoption of some acceptable plan for elections by single-member districts.

There are, however, substantial factual differences between the cases. Most significantly, perhaps, elections in Petersburg were by majority vote whereas those under Rome's pre-1966 rules are by plurality

---

100. *See City of Richmond, supra,* 422 U.S. at 373–375, 95 S.Ct. 2296 (even if annexations were originally undertaken with an impermissible purpose, they can be sustained under § 5 if at the time of decision there are sound non-discriminatory grounds to support them); *Perkins v. Matthews, supra,* 400 U.S. at 394–95, 91 S.Ct. 431 (even though voting change was offi-

cially made prior to effective date of the Act, change had to be submitted for preclearance because not implemented in fact until after effective date).

101. *See* note 99 *supra.*

102. Parties' First Stipulation of Facts ¶ 3.

vote—the latter rule, as we have noted, *see* notes 90–93 and accompanying text *supra*, being much more conducive to the election of a black candidate. Further, the facts recited by the Court in *City of Petersburg* reveal a far greater degree of racial polarization than is present in Rome's relatively benign racial atmosphere. And while Rome's elected officials have been quite responsive to the interests of the black community, the City Council of Petersburg was generally unresponsive to black needs.

The evidence in the present case tends to show that blacks will have a fair opportunity to obtain representation reasonably commensurate with their post-annexation voting strength. Rev. Hill, as we have noted, would have been elected to the 6-member Board of Education under a plurality system; and there is no reason why a similarly strong black candidate could not garner sufficient votes to win 1 of the 9 City Commission seats. A number of black witnesses stated that a black could win under a plurality system; [103] and only one black witness testified that single-member districts were necessary if blacks were to elect the candidate of their choice.[104] Moreover, adequacy of representation is not measured solely by the black community's ability to elect its first-choice candidate. Because blacks often hold the balance of power in Rome elections, they are situated to exert considerable influence over many elected officials, not simply those representing an exclusively black constituency. On the other hand, while single-member districts might guarantee the election of one representative of the black community, such a scheme could ironically diminish the overall effectiveness of representation by eliminating the inducement for white officials to respond sympathetically to black needs.

There are other disadvantages to judicially enforcing a switch to single-member districts that make us loath to do so absent a somewhat more compelling showing that existing voting rules and practices would operate discriminatorily. For one thing, as the Court noted in *City of Petersburg*, single-member districts can sometimes result in the hegemony of special interests over the needs of the whole community:

We recognize that the election from single-member districts of a number of governmental representatives to a body composed of several members, rather than being elected at-large from the governmental unit, has the effect of making the representatives from the single districts more responsive to the special interests and characteristics of the individual district. Conversely, the election of all such representatives from the governmental unit at-large (as from an entire city) generally causes the representatives to be more responsive to, and characteristic of, the interests of the entire city. representatives from single districts generally are more responsive to the special interests of their districts, and at-large representatives generally serve the entire community more effectively.

354 F.Supp. at 1027. We are also concerned at the intrusiveness of a federal court requiring the City, on pain of being frozen into outmoded boundaries, to abandon the at-large rule, which has been the fundamental premise of Rome's electoral system since 1918. Particularly because this Court has no authority, under section 5, to affect the at-large rule directly, *Beer v. United States*, 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), our conditioning approval of the annexations upon adoption of single-member districts might be viewed as inappropriate.

These various considerations are reinforced by the position taken by the Department of Justice on this issue. Although the Attorney General has suggested that single-member districts would be an appropriate means of minimizing the impact of the annexations, he has nowhere stated that this is the only acceptable approach. To the contrary, during the administrative proceedings, the Justice Department indicated

---

**103.** Joe Wright Deposition 14; Carmichael Deposition 15.

**104.** Moreland Deposition 45.

that it was willing to reconsider its objection to the annexations if the City agreed to revert to a simple plurality-win system. Indeed, the Attorney General *withdrew* his objection to the annexations insofar as they affected Board of Education elections because these elections reverted automatically to an acceptable plurality-win system when he interposed objections to the Board of Education's staggered term, majority voting, runoff election and residency provisions. The Attorney General did not withdraw his objection with respect to City Commission elections only because the residency requirement for these elections had been adopted prior to the date of the Act and therefore remained in effect. The implication was that the Attorney General would be willing to grant full preclearance to the annexations if the residency requirement were eliminated.[105]

While we in no way sit in judgment on the merits of the Attorney General's determinations made during administrative preclearance proceedings, *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977); *Briscoe v. Bell*, 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977), we do find this letter to be strong evidence of what the Attorney General would be willing to accept in the present proceeding. Further, because the residency requirement is a relatively minor and peripheral aspect of Rome's voting procedures, we do not perceive particular dangers of intrusiveness in-

herent in our conditioning approval of the annexations on its abandonment. We will therefore deny the City's motion as regards the annexations. However, this denial is without prejudice to renewal by the City, if it wishes to obtain preclearance, upon the undertaking of suitable action consistent with the views expressed herein.

## VI

For the reasons expressed in the preceding discussion, we grant the City's unopposed request for summary judgment on the transfer of voter registration duties to Floyd County. We deny the plaintiffs' motion for summary judgment, and grant that of the defendants, on Counts I, II, III and IV of plaintiffs' amended complaint. Count V, as we have noted, has previously been disposed of.[106] Treating the papers as motions for final judgment on the basis of the stipulated record with respect to Count VI, we grant the defendants' motion and deny that of the plaintiffs. However, this decision is without prejudice to renewal regarding that portion of the decision which concerns the effect of the annexations.

GASCH, District Judge.

I concur in the result.

---

**105.** The Justice Department's letter, in pertinent part, read as follows:

With respect to the objection to the 13 annexations, we are mindful of the suggestion in my October 20, 1975, letter that the Attorney General would reconsider his determination should 'the city, *inter alia*, undertake again to elect its councilmen and Board of Education members by a simple plurality-win system which does not incorporate the limiting features objected to therein. Since the continued objection to those features renders the majority vote requirement, numbered posts and residency requirement for Board of Education elections legally unenforceable the necessary effect of that objection is a reversion to the previously existing simple plurality-win system. In view of that circumstance, therefore, the Attorney General withdraws his objection to the 13 annexa-

tions insofar as Board of Education elections are concerned.

We cannot, however, reach a similar conclusion relative to City Commission elections. The pre-existing residency requirement for commission elections (which the Attorney General's objection does not reach because it did not constitute a change) prevents that electoral system from being a simple plurality-win system. Consequently, in view of the limiting residency feature in the context of at-large voting and indications that racial bloc voting exists, the Attorney General is unable to withdraw his objection to the 13 annexations insofar as City Commission elections are concerned.

Second Supplement to Parties' Stipulation of Facts, Ex. 45.

**106.** *See* note 49 *supra*.