# BRISCOE, GOVERNOR OF TEXAS, ET AL. *v.* BELL, ATTORNEY GENERAL, ET AL.

No. 76–60.   Argued April 20, 1977—Decided June 20, 1977

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. POWELL, J., concurred in the judgment.

*David M. Kendall,* First Assistant Attorney General of Texas, argued the cause for petitioners. With him on the brief were *John L. Hill,* Attorney General, *Thomas W. Choate,*

Special Assistant Attorney General, and *Lonny F. Zwiener,* Assistant Attorney General.

*Howard E. Shapiro* argued the cause for respondents. On the brief were *Acting Solicitor General Friedman, Assistant Attorney General Days, Deputy Solicitor General Wallace, Allan A. Ryan, Jr., Brian K. Landsberg,* and *Cynthia L. Attwood.*[*]

MR. JUSTICE MARSHALL delivered the opinion of the Court.

At issue in this case is the construction of § 4 of the Voting Rights Act of 1965, 42 U. S. C. § 1973b (1970 ed. and Supp. V). "The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting." *South Carolina* v. *Katzenbach,* 383 U. S. 301, 308 (1966). While the Act has had a dramatic effect in increasing the participation of black citizens in the electoral process, both as voters and elected officials, Congress has not viewed it as an unqualified success.[1] Most recently, as part of the 1975 amendments to the Voting Rights Act, 89 Stat. 400, Congress extended the Act's strong protections to cover language minorities— that is, citizens living in environments where the dominant language is not English. Congress concluded after extensive hearings that there was "overwhelming evidence" showing "the ingenuity and prevalence of discriminatory practices that have been used to dilute the voting strength and otherwise

---

[*]*Vilma S. Martinez, Joaquin Avila, Jack Greenberg, Eric Schnapper, David S. Tatel, Joseph L. Rauh, Jr., James T. Danaher, Armand G. Derfner, Albert E. Jenner, Jr., Nicholas DeB. Katzenbach, Stephen J. Pollak, Norman Redlich, Robert A. Murphy,* and *William E. Caldwell* filed a brief for the Mexican American Legal Defense and Educational Fund, Inc., et al. as *amici curiae* urging affirmance.

[1] See, *e. g.,* S. Rep. No. 94–295, pp. 13–15 (1975) (hereafter Senate Report); H. R. Rep. No. 94–196, pp. 6–8 (1975) (hereafter House Report).

affect the voting rights of language minorities." [2] Concern was particularly expressed over the plight of Mexican-American citizens in Texas, a State that had not been covered by the 1965 Act.[3] This case arises out of Texas' efforts to prevent application of the 1975 amendments to it.

## I

Petitioners, the Governor and Secretary of State of Texas, filed suit in the District Court for the District of Columbia against the Attorney General of the United States and the Director of the Census.[4] These officials are responsible for

---

[2] Senate Report 30, 35; House Report 22, 26–27. See § 4 (f) (1) of the Act, 42 U. S. C. § 1973b (f) (1) (1970 ed., Supp. V):

"The Congress finds that voting discrimination against citizens of language minorities is pervasive and national in scope. Such minority citizens are from environments in which the dominant language is other than English. In addition they have been denied equal educational opportunities by State and local governments, resulting in severe disabilities and continuing illiteracy in the English language. The Congress further finds that, where State and local officials conduct elections only in English, language minority citizens are excluded from participating in the electoral process. In many areas of the country, this exclusion is aggravated by acts of physical, economic, and political intimidation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting English-only elections, and by prescribing other remedial devices."

"The term 'language minorities' or 'language minority group' means persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage." § 14 (c) (3) of the Act, 42 U. S. C. § 1973l (c) (3) (1970 ed., Supp. V). See Senate Report 24; House Report 16. The language minority protections apply only to jurisdictions where "the Director of the Census determines that more than five per centum of the citizens of voting age . . . are members of a single language minority." § 4 (f) (3) of the Act, 42 U. S. C. § 1973b (f) (3) (1970 ed., Supp. V).

[3] See Senate Report 25–28; House Report 17–20.

[4] Also named as defendants were the Assistant Attorney General,

determining whether the preconditions for application of the Act to particular jurisdictions are met. See § 4 (b) of the Act, 42 U. S. C. § 1973b (b) (1970 ed., Supp. V).[5] Petitioners sought interlocutory injunctive relief to restrain official publication of respondents' determinations that Texas was covered by the 1975 amendments, and a "declaratory judgment" determining "how and under what circumstances the determinations . . . should be made." [6] Pet. for Cert. 6.

Respondents opposed the motion for a preliminary injunction, and moved to dismiss the suit for failure to state a claim upon which relief could be granted and for lack of jurisdiction to review determinations made under § 4 (b). The jurisdictional argument was based on the final paragraph of § 4 (b),

---

Civil Rights Division, the Secretary of Commerce, and the Public Printer of the United States.

[5] As pertinent to this case, § 4 (b) substantively provides:

"[T]he provisions of subsection (a) of this section shall apply in any State or any political subdivision of a State which (i) the Attorney General determines maintained on November 1, 1972, any test or device, and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the citizens of voting age were registered on November 1, 1972, or that less than 50 per centum of such persons voted in the Presidential election of November 1972."

[6] Petitioners argued that the Attorney General, in determining whether Texas had used a "test or device" of English-only elections, see § 4 (f)(3), 42 U. S. C. § 1973b (f)(3) (1970 ed., Supp. V), was obliged to consider whether it had done so "for the purpose or with the effect of denying or abridging the right to vote" as that is defined in § 4 (d). They argued that the Director of the Census should have interpreted "such persons," in the last clause of § 4 (b) quoted in n. 5, *supra,* to refer only to persons registered to vote rather than to all citizens. They also argued that even if their statutory interpretation claims were rejected, the Attorney General and the Director had violated their duties under the statute by failing to afford Texas a hearing before making the coverage determination and by incorrectly calculating the number of citizens and persons of Spanish heritage in Texas. Petitioners disclaimed any constitutional challenge to the Act.

which provides in pertinent part: "A determination or certification of the Attorney General or of the Director of the Census under this section . . . shall not be reviewable in any court . . . ." The District Court ruled, however, that this apparent preclusion of judicial review was not absolute. It found that there was jurisdiction to consider the "pure legal question" whether the Executive officials had correctly interpreted an Act of Congress. Reaching the merits of petitioners' claims, the District Court rejected them all and granted summary judgment for respondents.[7]

On appeal to the Court of Appeals for the District of Columbia Circuit, respondents discussed but did not "take issue with" the jurisdictional ruling of the District Court. The Court of Appeals nevertheless considered the issue carefully, concluding:

"It is . . . apparent that even where the intent of Congress was to preclude judicial review, a limited jurisdiction exists in the court to review actions which on their face are plainly in excess of statutory authority. . . . The district court in the instant case was careful to note that the actual computations made by the Director of the Census were *not* within its jurisdiction to review, and that its scope of review was limited to determining whether the Director acted 'consistent with the apparent

---

[7] After the District Court denied relief, the § 4 (b) coverage determination was officially published. 40 Fed. Reg. 43746 (1975).

The Attorney General found that Texas had maintained the "test or device" of English-only elections. The Director of the Census calculated from his agency's statistics that more than 5% of the voting age citizens in Texas were of Spanish heritage, and that 46.2% of voting age citizens cast ballots in the 1972 Presidential election:

*Estimated number*

| | |
|---|---|
| Voting age population on November 1, 1972 | 7,655,000 |
| Less aliens of voting age | 140,657 |
| Citizens of voting age | 7,514,343 |
| Votes cast | 3,472,714 |

App. 156.

meaning of the statute.' Narrowly defined in this manner, the jurisdiction of the trial court to consider the Director's determinations is supported by precedent . . . ." *Briscoe* v. *Levi,* 175 U. S. App. D. C. 297, 303, 535 F. 2d 1259, 1265 (1976).

Turning to the merits of petitioners' procedural and statutory construction arguments, the Court of Appeals thoroughly analyzed the statute and the legislative history. It found that respondents had correctly interpreted the Act and affirmed the judgment of the District Court.[8]

We granted certiorari *sub nom. Briscoe* v. *Levi,* 429 U. S. 997 (1976). Although respondents do not assert before us the jurisdictional objection raised in the District Court, we find that the courts below incorrectly concluded that they had power to review respondents' determinations that Texas was covered by the Act. See *Philbrook* v. *Glodgett,* 421 U. S. 707, 721 (1975), and cases there cited. We therefore order dismissal of the complaint without reaching the merits of petitioners' claims.

II

Section 4 (b) of the Voting Rights Act could hardly prohibit judicial review in more explicit terms. It states that a "determination or certification of the Attorney General or of the

---

[8] The Court of Appeals ruled that the definitions in § 4 (d) apply only in suits brought to terminate coverage under § 4 (a), and not to the Attorney General's determination under § 4 (b). It held that while the language of the statute was unclear, the legislative history and administrative and judicial interpretation of § 4 (b) clearly indicated that "such persons" referred to "citizens of voting age." The court also held that the Director properly relied on census figures in calculating the number of citizens of voting age, rejecting petitioners' "amalgams of estimates and hypotheses," 175 U. S. App. D. C., at 307, 535 F. 2d, at 1269, allegedly showing large numbers of illegal aliens in Texas. It found that while Texas was not entitled to any pre-determination hearing on coverage, it had been afforded ample opportunity to present information before the decision was made.

Director of the Census under this section . . . shall not be reviewable in any court and, shall be effective upon publication in the Federal Register." The language is absolute on its face and would appear to admit of no exceptions. The purposes and legislative history of the Act strongly support this straightforward interpretation.

The Voting Rights Act was conceived by Congress as a stern and powerful remedy to combat "an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *South Carolina* v. *Katzenbach,* 383 U. S., at 309. The stringent remedial provisions of the Act [9] were based on Congress' finding that "case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered . . . ." *Id.,* at 328. The intention of the drafters of the Act was "to shift the advantage of time and inertia from the perpetrators of the evil to its victims." *Ibid.* Reading § 4 (b) as completely precluding judicial review thus implements Congress' intention to eradicate the blight of voting discrimination with all possible speed.

The drafters' specific comments on § 4 (b) further support this view. The House Report stated that the coverage formula "requires certain factual determinations—determinations that are final when made and not reviewable in court." H. R. Rep. No. 439, 89th Cong., 1st Sess., 25 (1965). The minority report criticized the Act precisely because it went into effect "without evidence, without a judicial proceeding or a

---

[9] The Act suspends the operation of all "tests or devices," including English-only elections, in covered jurisdictions. § 4. Before such jurisdictions may implement any change in voting laws or procedures, they must secure the approval of the Attorney General or a three-judge court in the District of Columbia that the change will not violate the Act. § 5. In addition, federal registrars and observers may be appointed to effectuate compliance with the Act. §§ 6–9.

hearing of any kind." *Id.*, at 45; see also *id.*, at 43. The Report of the Senate Judiciary Committee sponsors of the Act also described § 4 as requiring "factual determinations . . . that are not reviewable in court." S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, p. 22 (1965).

Congress was well aware, however, that the simple formula of § 4 (b) might bring within its sweep governmental units not guilty of any unlawful discriminatory voting practices. It afforded such jurisdictions immediately available protection in the form of an action to terminate coverage under § 4 (a) of the Act. While this so-called "bailout" suit is subject to narrow procedural and substantive limitations,[10] § 4 (a) does instruct the Attorney General that if he "determines that he has no reason to believe that any . . . test or device" has been used for a prohibited purpose during the relevant time period, "he shall consent to the entry of . . . judgment" exempting the jurisdiction. See H. R. Rep. No. 439, *supra,* at 14–15, 19.[11]

Although this Court has never considered at length the scope of the § 4 (b) preclusion clause, we have indicated that the words of the statute mean what they say. In *South Carolina* v. *Katzenbach, supra,* the Court upheld the consti-

---

[10] The action may be brought only before a three-judge District Court in the District of Columbia, with direct appeal to this Court. Under the 1975 amendments, Texas would be required to show in such a bailout suit "that no . . . test or device has been used during the ten years preceding the filing of an action . . . for the purpose or with the effect of denying or abridging the right to vote on account of race or color, or in contravention of the [language minority] guarantees . . . ." § 4 (a). Another proviso of § 4 (a), and § 4 (b), further define the applicable standards.

[11] It is notable that a number of jurisdictions brought within the Act by the coverage formula have successfully exempted themselves in bailout suits. See Senate Report 12 n. 4, 13 n. 5; House Report 5 n. 4, 6 n. 5. The burden of proving nondiscrimination is thus not an impossible one by any means, and this ameliorative route has been available to Texas at all times.

tutionality of § 4 (b), which the Court stated "bar[red] direct judicial review of the findings by the Attorney General and the Director of the Census which trigger application of the coverage formula." 383 U. S., at 332. The Court recognized that § 4 (b) might be "improperly applied," but found that a bailout suit was the only available remedy. 383 U. S., at 333. The Court noted that "[t]his procedure serves as a partial substitute for direct judicial review." *Ibid.*

Similarly, in *Gaston County* v. *United States*, 395 U. S. 285 (1969), we stated that "[t]he coverage formula chosen by Congress was designed to be speedy, objective, and incontrovertible." *Id.*, at 291–292. A footnote added: "Section 4 (b) of the Act makes the determinations by the Attorney General and the Director of the Census unreviewable in any court." *Id.*, at 292 n. 6. See also *id.*, at 287. The significant part played by the discretionary authority of the Attorney General in administering the Act is also underlined by *Morris* v. *Gressette, post,* p. 491. There the Court finds no authority to review the Attorney General's failure to object, under § 5 of the Act, to a change in the voting laws of a covered jurisdiction. Although § 5 contains no express preclusion of review, the Court concludes from its structure and purposes that Congress intended no prolonged suspension of the operation of validly enacted state laws to allow judicial review. Since § 4 (b) expressly provides that the administrative determinations "shall not be reviewable in any court," and conclusions similar to those in *Morris* may be drawn from the statutory structure, the case for preclusion is, if anything, stronger here than in *Morris*.

We conclude, then, that the plain meaning and history of § 4 (b), the purpose and structure of the Act, as well as this Court's interpretation of it, indicate that judicial review of § 4 (b) determinations by the Attorney General and the Director of the Census is absolutely barred. There is in this case " 'persuasive reason to believe that such was the purpose

of Congress.' *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967)." *Dunlop* v. *Bachowski*, 421 U. S. 560, 567 (1975). "[T]he heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review" of this administrative decision has been met with the requisite " 'clear and convincing evidence.' " *Ibid.*[12]

Under these circumstances, the Court of Appeals erred in relying on cases that inferred jurisdiction to review administrative actions where there was no clear showing of preclusion.[13] Since different congressional enactments have distinct

---

[12] Petitioners argued in support of reviewability in the District Court that because the preclusion paragraph of § 4 (b) contains the statement that coverage determinations "shall be effective upon publication in the Federal Register," review is foreclosed only after publication, but is available before. This case was commenced prior to publication of the coverage determination. Petitioners' argument tortures the plain meaning of the paragraph, which is made up of two independent clauses. The first precludes review without limitation as to time; the second establishes the precise date at which a coverage determination becomes effective, thereby requiring, for example, preclearance of any laws affecting voting rights after that date.

[13] The Court of Appeals primarily reasoned by analogy with *Leedom* v. *Kyne*, 358 U. S. 184 (1958). The issue there was whether a district court had jurisdiction to review a claim that the National Labor Relations Board had acted "in excess of its delegated powers and contrary to a specific [statutory] prohibition," *id.*, at 188, in certifying a collective-bargaining unit. While § 9 (d) of the National Labor Relations Act, 29 U. S. C. § 159 (d), arguably divested the district courts of jurisdiction, it contained no express language to that effect. It merely specified the manner in which the record of a certification proceeding would be transmitted to a court of appeals for ultimate review in the event an unfair labor practice case followed an employer's refusal to bargain with a certified union. The action in *Leedom* was brought by a group of employees affected by the NLRB's admitted violation of the Act in certifying their bargaining unit. The Court noted that unless the District Court had jurisdiction, the employees might never secure review of the Board's error. Absent express preclusion, the Court was unwilling to find that Congress intended to allow " 'obliteration of a right which Congress' has given

purposes and use diverse means to achieve them, each case raising an administrative reviewability question must be analyzed on the basis of the specific statutory provisions involved. If the intent of Congress is unmistakable—and we have no doubt that it is here—the only remaining issue is whether prohibiting judicial review is constitutionally permissible.

On that score, the finality of determinations under § 4 (b), like the preclearance requirement of § 5, may well be "an uncommon exercise of congressional power," *South Carolina* v. *Katzenbach,* 383 U. S., at 334; see also *Morris* v. *Gressette, post,* at 501. But there can be no question that in attacking the pervasive evils and tenacious defenders of voting discrimination, Congress acted within its "power to enforce" the Four-

---

[the affected employees], for there is no other means, within their control . . . to protect and enforce that right." 358 U. S., at 190.

By contrast in this case, § 4 (b) on its face forecloses judicial review. No inference from the structure of the statute nor from its legislative history, cf. 358 U. S., at 191–201 (BRENNAN, J., dissenting), is necessary to make its meaning plain. And as we have noted, preclusion of review of § 4 (b) determinations does not wholly pretermit judicial action by the affected jurisdiction to terminate coverage.

The Court of Appeals also erred in relying on *Thermtron Products, Inc.* v. *Hermansdorfer,* 423 U. S. 336 (1976). At issue there was the authority of a court of appeals to grant mandamus relief against the improper remand to a state court of an action previously removed to federal court. A remand order is generally "not reviewable on appeal or otherwise." 28 U. S. C. § 1447 (d). We held, however, that review is not precluded if the order is based " 'on grounds wholly different from those . . . which [the statute authorizing remand, 28 U. S. C.] § 1447 (c) permits.' " *Gravitt* v. *Southwestern Bell Tel. Co.,* 430 U. S. 723, 724 (1977). Where the order is based on one of the enumerated grounds, review is unavailable no matter how plain the legal error in ordering the remand. *Id.,* at 723.

While we express no opinion on the question whether § 4 (b) precludes review of coverage determinations based on criteria not specified in the statute, we note that in the present case, there is no question that the Attorney General and the Director of the Census relied solely upon the statutory grounds in finding Texas covered by the Act.

teenth and Fifteenth Amendments "by appropriate legislation." *South Carolina* v. *Katzenbach, supra.*

For the foregoing reasons, we hold that the courts below erred in finding that they had jurisdiction to review petitioners' claims of erroneous application of § 4 (b). The only procedure available to Texas to seek termination of Voting Rights Act coverage is a bailout suit under the strict limitations of § 4 (a). Accordingly, the decision of the Court of Appeals is vacated, and the case is remanded with instructions to direct the District Court to dismiss the complaint.

*It is so ordered.*

MR. JUSTICE POWELL concurs in the judgment of the Court.