HURON VALLEY HOSPITAL, INC., a Michigan Non-Profit Corporation, Plaintiff,

v.

CITY OF PONTIAC, a Michigan municipal corporation; City of Pontiac Hospital Building Authority, a Michigan municipal corporation; Pontiac Osteopathic Hospital, a Michigan non-profit corporation; Crittenton Hospital, a Michigan non-profit corporation; Sisters of Mercy Corporation, a Michigan non-profit corporation; Comprehensive Health Planning Council of Southeastern Michigan, a health systems agency; North Oakland County Planning Steering Committee, a planning group under the auspices of Greater Detroit Area Health Council, Inc., a Michigan corporation; United States Department of Health and Human Services, an executive agency of the United States; Margaret Heckler, as Secretary of the Department of Health and Human Services; Bailus Walker, Jr.; Maurice S. Reizen, M.D.; Herman A. Ziel, M.D.; Richard Reihmer; Paul Masseron and Terence E. Carroll, Defendants.

Civ. A. No. 78–72970.

United States District Court, E.D. Michigan, S.D.

April 30, 1984.

James C. Foresman, Southfield, Mich., Reed, Goldstein & Jenkins-Reed by Kenneth R. Reed and John P. Morris, P.C., Tempe, Ariz., for plaintiff.

Miller, Canfield, Paddock & Stone by Larry J. Saylor, Detroit, Mich., for defendants City of Pontiac and City of Pontiac Hosp. Bldg. Authority.

Dykema, Gossett, Spencer, Goodnow & Trigg by Roger K. Timm, Detroit, Mich., for defendants Pontiac Osteopoathic Hosp. and Crittenton Hosp.

Martin, Maxwell, Smith, Buhl & Hanson, P.C. by Robert A. Maxwell, Bloomfield Hills, Mich., for defendant Sisters of Mercy Corp.

Riley & Roumell by Timothy M. Guerriero, Detroit, Mich., for defendants Comprehensive Health Planning Council of Southeastern Mich., Paul Masseron and Terence E. Carroll.

Long, Preston, Kinnaird & Avant by Grady Avant, Jr., Detroit, Mich., for Defendants North Oakland County Planning Steering Committee and Greater Detroit Area Health Council, Inc.

Charles Sorenson, Dept. of Justice, Civil Div., Washington, D.C., for defendants U.S. Dept. of Health and Human Services and Margaret Heckler.

Edwin M. Bladen, Asst. Atty. Gen., Lansing, Mich., for defendants Balius Walker, Jr., Maurice S. Reizen, M.D., Herman A. Ziel, M.D. and Richard Reihmer.

## OPINION

GILMORE, District Judge.

Plaintiff Huron Valley is a Michigan nonprofit corporation organized to construct and operate a medical/surgical acute-care facility in Oakland County, Michigan. It has been issued a certificate of need (CON) for a 153 bed hospital, and is presently in the process of arranging for the financing and construction of this facility.

Count I of the complaint is a claim under Section 1 of the Sherman Act alleging that, beginning in April 1976, the non-federal defendants engaged in a conspiracy in restraint of trade to reduce and eliminate competition in the hospital services business by preventing plaintiff from entering the market.[1] The plaintiff alleges that de-

1. The action was originally filed in 1978 by plaintiff alleging antitrust violations. In March 1979, Judge Kennedy, this Court's predecessor, granted defendants' motion for summary judgment. 466 F.Supp. 1301 (E.D.Mich.1979). Although Judge Kennedy held that a decision on the merits of the case should be stayed pending resolution of state court proceedings, she reached the merits of plaintiff's antitrust claims and held that defendants were entitled to immu-

nity under various antitrust immunity doctrines.

In 1981, the 6th Circuit reversed and remanded. *Huron Valley Hospital, Inc., v. City of Pontiac,* 666 F.2d 1029 (6th Cir.1981). It did not reach the merits of Judge Kennedy's opinion, but ordered a stay of the antitrust claims pending "completion of the state proceedings before attempting to establish the borderline between the

fendants conspired to prevent plaintiff from getting the necessary certificate of need from the Michigan Department of Public Health. Plaintiff alleges anti-competitive effects and monopoly, and damages in excess of $200,000,000 in connection with the denial of a first certificate of need, and more than $170,000,000 in connection with the denial of a second certificate of need.

Count II is a claim under 42 U.S.C. § 1983 against the state officials and state hospitals involved alleging a conspiracy to deny plaintiff's Fourteenth Amendment due process rights.

Count III, with which this opinion is concerned, is a request for a writ of mandamus against the Department of Health and Human Services and its secretary, Margaret Heckler, in her official capacity, directing HHS to reinstate a previously-issued decision approving plaintiff for capital expenditure approval, pursuant to Section 1122 of the Social Security Act, 42 U.S.C. § 1320a–1. For all practical purposes, the denial of Section 1122 approval is the only obstacle preventing plaintiff from beginning construction of its hospital, an effort which began in 1976. Both plaintiff and the Secretary have filed motions for summary judgment in Count III. For the reasons given, the writ of mandamus will issue, and the Secretary will be ordered to reinstate its Section 1122 approval.

I

To make a complicated story short, in order for plaintiff to build its hospital it must obtain a CON from the State of Michigan and capital expenditure approval from

HHS under Section 1122 of the Social Security Act, *supra*. The Section 1122 program, along with the National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300k et seq., are major federal programs established to cut down unnecessary medical costs. Under this legislation, states, including Michigan, have established CON programs to insure that new hospital construction or expansion of existing facilities are not undertaken in areas where they are not needed. The Michigan Department of Public Health (MDPH) is the agency of the State of Michigan which administers both the CON program and the Section 1122 program, pursuant to a contract with HHS. MDPH is a state designated planning agency (DPA) under Section 1122.

Section 1122 is a federal program designed to supplement state CON programs and to insure that federal funds are not expended on extensive health care projects that have not undergone local planning review and approval from the appropriate state health planning agency. Once a facility has received approval by a state DPA under Section 1122, the facility can be reimbursed with federal funds for that portion of a patient's bill constituting capital costs, that is, depreciation, interest, or return on equity capital.

In 1976, plaintiff filed its joint application for CON and Section 1122 approval. In July 1977, the MDPH notified plaintiff that its CON application was denied.[2] The parties agreed to stay decision on the Section 1122 application pending resolution of the CON issue. A year later, in June 1978, plaintiff had a hearing on the denial of its CON. In April 1979, the MDPH issued a

antitrust laws and the new regulatory scheme in this case." *Id.* at 1035.

Although not directly on point with the issues regarding the Secretary's actions in this case, a careful reading of the opinion of the Sixth Circuit demonstrates two central points relevant here—1) a concern and deference to the opinions of the Michigan courts regarding the implementation of this regulatory scheme, and 2) a serious concern for the danger of administrative capture under this regulatory scheme and the potential need for judicial intervention to con-

trol and limit agency discretion. *See* 666 F.2d at 1035.

Pursuant to this opinion, this Court entered a stay on June 23, 1982. At a pretrial conference on November 8, 1983, all parties agreed that the stay should be lifted, and plaintiff was allowed to file an amended complaint on November 15, 1983.

2. This denial is contained in Defendant's Exhibit 2, and states: "This denial applies to both Section 1122 and Act (256) (the state CON program)."

report, and in January 1980, a final report was issued denying plaintiff the CON. Plaintiff appealed this decision to the Oakland County Circuit Court, and in March 1981 the Circuit Court entered an order requiring MDPH to issue plaintiff its CON immediately. *Huron Valley Hospital, Inc. v. Michigan State Health Facilities Commission,* No. 80–20439–AA (Oakland County Circuit Court, March 27, 1981). This was appealed and affirmed by the Michigan Court of Appeals. *Huron Valley Hospital, Inc. v. Michigan State Health Facilities Commission,* 110 Mich.App. 236, 312 N.W.2d 422 (1981). Leave to appeal was denied by the Michigan Supreme Court. 413 Mich. 853 (1982).

MDPH issued a CON to plaintiff, but only for $14,000,000. Plaintiff claimed that this amount was far too low, because this was a five-year-old figure, and again sought relief in Oakland County Circuit Court. On October 21, 1982, the Circuit Court upheld plaintiff's position and ordered MDPH to issue a new CON based on new amounts found by MDPH to be reasonable. Finally, on October 26, 1982, MDPH issued a certificate of need to plaintiff in the amount of $44,651,000. Thus, after six years, plaintiff had its CON, and presently has another CON application pending to build an additional 150 beds to its approved 153 bed base.

The Court has already outlined the difficulty plaintiff had in obtaining its CON. The Oakland County Circuit Court, in its opinion of March 1981 reversing the decision of MDPH and ordering the issuance of a CON immediately, found MDPH's denial of a CON to be arbitrary and capricious and based not upon any finding that plaintiff's facility was not needed, but instead upon a preference for already existing facilities. The court dealt at length with the issue of overbedding, and found assertions about overbedding to be false, pointing out that the plaintiff's rivals were allowed to build new beds while plaintiff was not. It

found that MDPH had a "predisposition" to protect Pontiac General Hospital, and that plaintiff's plan would allow for a "redistribution of existing beds at cost savings," slip opinion at 7, and that plaintiff had met the requirements for a finding of need.[3] It specifically rejected the argument that any further proceedings were necessary in the matter, including further administrative findings. Slip opinion at 11.

The Michigan Court of Appeals also rejected any argument that plaintiff's plan presented a danger of overbedding, holding that the record reflected agency bias for existing hospitals, and that the state's denial of plaintiff's CON was merely a "post hoc rationalization." 110 Mich.App. at 247, 312 N.W.2d 422. That court rejected remanding the case for further administrative action, finding that it would be futile. *Id.* at 250, 312 N.W.2d 422.

## II

Meanwhile, plaintiff was engaged in discussions with MDPH regarding its pending Section 1122 approval. After much discussion, including the intervention of the Michigan Attorney General, MDPH, issued a recommendation for Section 1122 approval, and on February 24, 1983, Dr. Frank Ellis, the Regional Health Administrator for Region V of HHS, and the individual charged by statute with making the decision, issued Section 1122 approval on behalf of HHS. Comprehensive Health Planning Council of Southeastern Michigan and other hospitals that are defendants in this lawsuit then filed a series of *ex parte* requests for reconsideration of Dr. Ellis' Section 1122 approval. These were filed with Dr. Robert Graham, an administrator and Assistant Surgeon General in Washington, D.C.

On September 13, 1983, Dr. Graham reversed and vacated the original Section 1122 approval. Dr. Graham had three suggestions for plaintiff—1) complete an appeal of the 1977 Section 1122 denial by

**3.** The Oakland County Circuit Court also found the agency action to be against the public interest: "most significantly the prejudicial effect on plaintiff and the citizens within the plaintiff's primary service area, caused by the Department's predisposition to protect Pontiac General Hospital cannot be remedied." Slip opinion at 11.

MDPH; 2) submit an entirely new Section 1122 application; or 3) ask the state to reconsider its original Section 1122 denial. Plaintiff had no imput into this reconsideration, and was given no opportunity to be heard.

Dr. Graham's basic position, supplied to him by the *ex parte* intervenors, was that the State of Michigan, through the MDPH, had "caved-in" to plaintiff by following the orders of the Michigan courts to issue the CON approval. Since MDPH had never made a specific "finding" that the plaintiff met the standards for Section 1122 approval, having instead believed itself forced to do so by the Michigan courts, HHS could not grant Section 1122 approval.

The logic of this position is baffling. MDPH never wanted to issue plaintiff a CON or Section 1122 approval in the first place. It was required to do so by Michigan courts and the Michigan Attorney General. To ask plaintiff to return to MDPH after six years of fighting on the issue in order to ask it to make a finding it does not want to make defies logic.

The MDPH and the Michigan Attorney General clearly believed, and correctly, that its decision-making process regarding both the CON and Section 1122 application were the same. It denied them both initially for the same reasons. It clearly believed that the decisions of the Michigan courts regarding the CON application were equally valid and binding on the state's consideration of the Section 1122 application. The Michigan courts dealt with all of the substantive decisions necessary to make a proper Section 1122 finding, and thus their decisions mandated such a finding by the MDPH. Dr. Graham's statements that the decisions of the Michigan courts were

"purely procedural" are not supported by a careful reading of these decisions.

### III

This action seeks a writ of mandamus to require the Secretary to reinstate the previously issued Section 1122 approval.

As a threshold matter, the Secretary contends that this Court has no power to review her decision overturning the Section 1122 approval issued by the Regional Health Administrator, Dr. Frank Ellis. The statutory scheme for Section 1122 is found at 42 U.S.C. § 1320a–1. The Secretary argues that Section 1122(f) [4], 42 U.S.C. § 1320a–1(f), *supra,* shields Dr. Graham's activities in this case. The Secretary cites cases that have authorized preclusions of judicial review, when Congress intended to do so, and this Court has no quarrel with the reasoning of these cases.[5] However, the issue is not that simple here. The Secretary's position here is contrary to all of the existing case law interpreting Section 1122, contrary to the position advocated by the Secretary herself in all of the previous cases, contrary to the language of the statute, and not in keeping with Congressional intent.

As a starting principle:

"[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is a persuasive reason to believe that such was the purpose of Congress." A clear command of the statute will preclude review; and such command may be inferred from its purpose.... It is, however, "only upon a showing of clear and convincing evidence of a contrary legislative intent" that the courts should restrict access to judicial review.

---

**4.** Section 1122(f) provides: Reconsideration of determination. Any person dissatisfied with a determination by the Secretary under this section may within six months following notification of such determination request the Secretary to reconsider such determination. A determination by the Secretary under this section shall not be subject to administrative or judicial review.

**5.** In fact, in *Brooks v. Cleland,* 531 F.Supp. 103, (E.D.Mich.1982), this Court fully recognized judicial preclusion in dealing with a matter challenging a determination of the Veteran's Administration.

*Barlow v. Collins,* 397 U.S. 159, 166–167, 90 S.Ct. 832, 837–838, 25 L.Ed.2d 192 (1970), quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

Further, in *Briscoe v. Bell,* 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977), the Supreme Court instructed that a case-by-case analysis must be made in each situation where there is a judicial preclusion issue.

> [E]ach case raising an administrative reviewability question must be analyzed on the basis of the specific statutory provisions involved. If the intent of Congress is *unmistakable*—. . . the only remaining issue is whether prohibiting judicial review is constitutionally permissible. (Emphasis added)

432 U.S. at 414, 97 S.Ct. at 2434.

Thus, a statute purporting to preclude judicial review in a given situation must be narrowly interpreted, and the judicial preclusion must be in keeping with congressional intent. Further, the burden is on the Secretary to overcome the strong presumption in favor of judicial review by "clear and convincing evidence." The Secretary has not met her burden here.

The plain language of the statute must first be examined. It states, in Section 1122(f), that: "A determination by the Secretary *under this section* shall not be subject to administrative or judicial review." (Emphasis added)

Thus the first question is whether under the plain language of the statute Dr. Graham's actions were "a determination . . . under this section." A careful reading of Section 1122(d), 42 U.S.C. § 1320a–1(d), demonstrates that Congress provided for only "two determinations" to be made by the Secretary—1) a determination regarding lack of 60-day notice, and 2) a determination in a situation where the state DPA has made a negative finding. Only the first is even arguably relevant here, since the state has made a *positive* recommendation in this case. However, no one contends that there is an issue here as to lack of 60-day notice.

There was simply no statutory authorization for Dr. Graham's action in this case. In the face of the overwhelming presumption in favor of judicial review, this Court cannot find by clear and convincing evidence that this was a "determination" that the Congress intended to withdraw from judicial review. The implementing regulation, 42 C.F.R. § 100.108(a), confirms this view. It clearly states again that the Secretary can deny Section 1122 approval only in two situations—1) where there is lack of 60-day notice; or 2) where the state DPA has submitted a negative recommendation. Neither has occurred here, and, under the Secretary's own regulations, the Secretary must grant Section 1122 approval in this situation.

This interpretation of Section 1122 is consistent with the records submitted in this case, including the Secretary's own exhibits. The Secretary's Exhibit 14 states at page 17: "The only ground for reversal of the positive recommendation (of the DPA) is a determination by the RHA that timely notice was not given. . ." Exhibit 15 of the Secretary, at page 4, contains this statement: "Where the DPA submits a positive finding and recommendation, the RHA cannot exclude payments representing the capital investment." Exhibit 15 also contains an organizational flow chart outlining Section 1122 procedures, and indicates no procedure for reversing an RHA determination based on a positive recommendation of the state DPA.

Plaintiff's Exhibit H contains a series of opinion letters issued by the Secretary in prior cases which state: "The statute does not provide for the Secretary to review the process used by the HSA (the state DPA in that case) in conducting its review and making its findings." (Letter of Henry A. Foley to George E. Hutchinson). This is what Dr. Graham attempted to do.

The Court recognizes that these exhibits and letters are not binding upon the Secretary in this case; it is this Court's independent interpretation of the statute that is decisive. Nevertheless, these exhibits indi-

cate that this interpretation fits in squarely with the regulatory scheme, including the Secretary's own interpretation of it. Additionally, the case law interpreting Section 1122 supports the view that there are only two "determinations" the Secretary can make under Section 1122 and that what Dr. Graham did here was not provided for by the statute.

*Wilmington United Neighborhoods v. United States*, 615 F.2d 112 (3d Cir.), *cert. denied*, 449 U.S. 827, 101 S.Ct. 90, 66 L.Ed.2d 30 (1980), is cited by the Secretary for its bare holding that Section 1122(f) barred judicial review in that case. However, *Wilmington United Neighborhoods* barred judicial review of a decision of the Secretary granting Section 1122 approval, *after a positive recommendation had been made by the state DPA*, stating: "Following its approval by the DPA, the Secretary then performs the ministerial act of assuring that the proper procedure has been followed." *Id.* at 115.

Plaintiffs in that case made a very similar argument to Dr. Graham's argument here. They claimed that state approval, according to the dictates of state law, was not enough and that the HHS had an independent duty to determine whether or not the project was consistent with federal standards. The *Wilmington United Neighborhoods* court rejected this argument, stating: "the Secretary has mere ministerial duties when a state has approved an application; he therefore lacks discretionary power to override the decision of the DPA once the state agency has approved by proper procedure a proposed capital expenditure." *Id.* at 118. *See also NAACP v. Medical Center, Inc.*, 584 F.2d 619 (3rd Cir.1978), where the court said: "The statute does not allow the Secretary to reconsider the merits of a proposed project after approval by the state and local planning agencies." *Id.* at 630.

In accordance with this is *Hollingsworth v. Schweiker*, 664 F.2d 526 (5th Cir.1981), which held that 42 CFR § 100.108(a) is the only regulation establishing the scope of HHS review of state determinations and that Congress did not provide the Secretary with the power to deny reimbursement for substantive reasons when the state recommends otherwise.

*Hollingsworth* also rejected another argument made by the Secretary in this case. Here the Secretary seizes upon the "approved by proper procedure language" in *Wilmington United Neighborhoods, supra*, arguing that Dr. Graham was merely assuring that the state had "approved by proper procedure," and that Dr. Graham's determination was therefore only "procedural." *Hollingsworth* specifically rejected this argument and stated that the only "proper procedure" for the Secretary to consider in a case where a state DPA had issued a positive recommendation is whether or not the 60-day notice requirement was met, and that is the only "procedure" the Secretary is to concern herself with. *Id.* at 530. In addition, *Hollingsworth* found judicial review available under Section 1122 in cases like the present one where the agency failed to follow the procedures outlined in the regulations adopted by the agency. *See also First Federal Savings and Loan v. Casari*, 667 F.2d 734 (8th Cir.), *cert. denied*, 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982).

It is clear that the Section 1122 program is designed to supplement already existing CON programs in the states. The purpose is to insure that Federal funds are not expended on extensive health care projects until those projects have undergone local planning review and received approval from the appropriate state health planning agency. The program is structured to utilize existing state health care agencies, and to allow concurrent project review under both existing state CON programs and the Section 1122 program.

The intent to provide state autonomy is clear: "The bill would in no way change the autonomy or authority of existing State and local planning agencies." H.R.Rep. No. 231, 92d Cong., 2d Sess., *reprinted in* [1972], U.S.Code Cong. & Admin.News, pp. 4989, 5066. The legislative history of the act demonstrates a concern for using al-

ready existing agencies for allowing state and local autonomy and for limiting federal involvement. Congress intended Section 1122 to contain hospital costs by limiting federal reimbursements covering capital expenditures for health care to those expenditures deemed necessary by the states, and to encourage rational health care planning by the states. *NAACP v. Medical Center, Inc., supra,* at 627–28.

The surest way to diminish the autonomy and authority of state or local planning agencies would be to allow the Secretary to review positive state DPA recommendations. There is certainly nothing in the legislative history of this Act to establish that Congress intended to preclude the type of decision made by Dr. Graham, a decision contrary to the entire statutory scheme, from judicial review.

One other point is demonstrated by the statutory scheme. The procedure established by Section 1122 is a streamlined procedure designed to avoid unnecessary delay in the construction of needed facilities. A proponent of a facility has a right to a full hearing before an administrative agency if the state planning agency has denied its Section 1122 application. *See* Section 1122(b)(3). It would be fully in keeping with Congressional intent to deny a proponent judicial review under Section 1122(f) after he has had an opportunity for such a hearing. This also would be in keeping with similar statutes denying judicial review, and would further the Congressional intent to preserve state autonomy.[6]

However, Congress rejected giving *opponents* of the capital expenditure a hearing. It did this by imposing narrow guidelines on the discretion given to the Secretary once a state DPA has given its approval. This was done precisely to prevent what happened here. Congress did not want opponents of expenditures, special interests, or competing private interests to tie up

proceedings when they had failed at a state level. Thus, the judicial preclusion provision, when read in the spirit of Congressional intent, is designed, above all, to give a measure of protection to proponents, like Huron Valley, who have been approved by the state DPA.

As pointed out in *Hollingsworth, supra,* at p. 529:

"While Congress was concerned with only funding necessary health facilities, it was also concerned with developing a streamlined procedure that would avoid delaying construction of needed facilities... Congress accommodated these two divergent goals by granting protection to the proponents of health facilities, which it denied others. In other words, to streamline the procedure, Congress chose to err on the side of overfunding."

To turn this judicial review preclusion provision, designed to protect plaintiff here, against plaintiff, would be contrary to the entire statutory scheme. The Secretary has not met her burden of showing by "clear and convincing" evidence that Congress intended to preclude review of Dr. Graham's action.

### IV

28 U.S.C. § 1361 provides: "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." The Court, having established jurisdiction, must consider the appropriate relief.

"The appropriateness of mandamus relief turns on the existence of a clear right in the plaintiff to demand the performance by the defendant of a plainly defined, peremptory and ministerial duty, and the lack of an adequate remedy other than manda-

---

**6.** In other judicial preclusion cases the party seeking judicial review had another remedy immediately available. *See Briscoe v. Bell,* 432 U.S. 404, 97 S.Ct. 2428, 53 L.Ed.2d 439 (1977) ("bailout suit" available). Here, having been granted *approval* by the state DPA, plaintiff has

no other meaningful recourse available aside from judicial review. Courts have been especially attentive to allowing judicial review in such situations. *Michigan Academy of Family Physicians v. Blue Cross and Blue Shield of Michigan,* 728 F.2d 326 (6th Cir.1984).

mus." *Vishnevsky v. United States*, 581 F.2d 1249, 1253 (7th Cir.1978).

■ Plaintiff has received Section 1122 approval from the designated planning agency of the State of Michigan under contract with HHS to give such approval. It is clear that plaintiff has a "plainly defined, peremptory and ministerial" right to such approval. Dr. Graham's claim that the state never made a "proper finding" as to whether plaintiff's hospital was in conformity with the applicable plans, criteria, etc. under Section 1122 because the state "caved in" to decisions of Michigan courts is without merit. The decisions of the Michigan courts in this case provide all the necessary findings of need under Michigan law to meet the requirements of both the CON program and Section 1122. It is clear from the statutory scheme and Congressional intent to preserve state and local autonomy that Congress provided no role for HHS administrators to second-guess state judicial decisions, or decisions of state DPAs. The entire scheme, to the contrary, was designed to prevent such interference.

Further, the Secretary's argument that there is an adequate remedy other than mandamus is without merit. It is simply inequitable to assert that plaintiff, after waiting eight years since its original application, with its existing state CON approval due to expire in April 1984, should attempt another round of administrative activity. The Michigan courts have repeatedly held that any further administrative remedies in the case are futile.

This Court has no choice but to issue a writ of mandamus, ordering the Secretary to reinstate plaintiff's Section 1122 approval forthwith. Plaintiff's motion for summary judgment is therefore granted, and the Secretary is directed to reinstate the previously issued determination providing for Section 1122 capital expenditure approval. Pursuant to FRCP 54(b), this Court will make an express determination that there is no just cause for delay, and directs the entry of a final judgment as to Count III of the complaint.